CITY AND COUNTY OF DENVER, acting By and Through its BOARD OF WATER COMMISSIONERS, Plaintiff,

and

Mountain States Legal Foundation et al., Plaintiffs-Intervenors,

v.

Robert BERGLAND, Secretary of the United States Department of Agriculture; John R. McGuire, Chief, United States Forest Service; Craig W. Rupp, Regional Forester, Rocky Mountain Region, United States Forest Service; Cecil D. Andrus, Secretary of the Interior; Dale D. Andrus, State Director, Bureau of Land Management of the Department of the Interior; and the United States of America, Defendants,

and

Sierra Club, American Wilderness Alliance, and the Board of County Commissioners of the County of Grand, Colorado, Defendants-Intervenors.

Civ. A. No. 79–K–611.

United States District Court,
D. Colorado.

May 29, 1981.

As Amended June 2, 1981.

Wayne D. Williams, Michael L. Walker, Denver, Colo., for plaintiffs.

Joseph F. Dolan, U. S. Atty., Hank Meshorer, Atty., Dept. of Justice, Land and Natural Resources Div., Denver, Colo., for Dept. of Justice, Land & Natural Resources Div.

John R. Little, Regional Sol., Dept. of the Interior, Denver, Colo., Nancy Stanley, Trial Atty., Dept. of Justice, Land and Natural Resources Div., Washington, D. C., Jack E. Hanthorn, Regional Atty., Michael J. Gippert, Dept. of Agriculture, Denver, Colo., for defendants.

H. Anthony Ruckel, Denver, Colo., for Sierra Club.

Kea Bardeen, Denver, Colo., for Mountain States Legal Foundation.

Henry W. Ipsen, Kirkland & Ellis, Denver, Colo., Gerald E. Dahl, Frisco, Colo., for Board of County Com'rs of Grand County.

## OPINION

KANE, District Judge.

This is an action arising out of a dispute between the Denver Water Board and the United States Forest Service regarding Denver's right-of-way over national forest lands in the Williams Fork Basin, Arapahoe National Forest. The right-of-way was granted to Denver in 1924 by the federal government pursuant to the Act of 1905, 33 Stat. 628, 16 U.S.C. § 524. Denver had conducted minimal construction on the right-of-way to develop its water resources since the granting of the right-of-way. The central issues of the dispute are whether Denver has constructed off its right-of-way, and, if so, whether it must forfeit its existing right-of-way, whether it may continue construction under a theory that the federal government approved construction off the right-of-way, or whether it must file an amendment requesting a change or extension of its right-of-way, and in doing so comply with federal environmental regulations, in order to continue construction off the right-of-way. Ancillary to these issues is the issue of whether Denver is required to comply with state and county land use control statutes and regulations as part of the process of obtaining a right-of-way permit from the Forest Service, if such is required, and whether and to what extent federal environmental laws mandate compliance with such statutes and regulations.

The parties involved in the litigation are the City and County of Denver, acting by and through its Board of Water Commissioners, a municipal corporation of the State of Colorado authorized and created by Article XX of the Constitution of the State of Colorado; plaintiff-intervenor Mountain States Legal Foundation, a non-profit membership corporation of the State of Colorado; defendant Bergland, the Secretary of Agriculture of the United States acting in his official capacity; defendant McGuire, the Chief of the United States Forest Service acting in his official capacity; defendant Rupp, the Regional Forester, Rocky Mountain Region of the United States Forest Service acting in his official capacity; defendant Cecil D. Andrus, the Secretary of the Interior of the United States acting in his official capacity; defendant Dale Andrus, the State Director of the Bureau of Land Management of the Department of the Interior acting in his official capacity; defendant-intervenor Board of County Commissioners of the County of Grant, a governmental subdivision of the State of Colorado, created by Article XIV of the Constitution of the State of Colorado; defendant-intervenor Sierra Club, a non-profit corporation of the State of California; defendant-intervenor American Wilderness

Alliance, a non-profit corporation of the State of Colorado.

## I. FINDINGS OF FACT

### History of the Legislation

On March 3, 1891, the Congress of the United States approved the Creative Act of 1891, 26 Stat. 1103, 16 U.S.C. § 471, which provided, in pertinent part:

Sec. 24. The President of the United States of America may, from time to time set apart and reserve, in any State or Territory having public lands bearing forests, in any part of the public lands ... as national forests, and the President shall by public proclamation declare the establishment of such forests and the limits thereof.

On June 4, 1897, Congress approved the Organic Administration Act, 30 Stat. 35, 16 U.S.C. § 551, which provided, in pertinent part:

The Secretary of Interior [1] shall make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside or which may be hereafter set aside under the said Act of March 3, 1891, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction.

On February 1, 1905, the Congress of the United States approved "An Act providing for the transfer of forest reserves from the Department of the Interior to the Department of Agriculture." 33 Stat. 628. Section 4 of the Act, codified at 16 U.S.C. § 524, provided as follows:

That rights-of-way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, within and across the forest reserves of the United States, are hereby granted to citizens and corporations of the United States for municipal or mining purposes, and for the purpose of the milling and reduction of ores, during the period of their beneficial use under such rules and regulations as may be prescribed by the Secretary of the Interior, and subject to the laws of the state or territory in which said reserves are respectively situated.

Section 1 of the Act of 1905 transferred the powers over national forest lands hitherto exercised by the Secretary of the Interior to the Secretary of Agriculture. *See* 16 U.S.C. § 472. Section 3 of the Act initiated the creation of a specific arm within the Department of Agriculture to be known as the "Forest Service." 16 U.S.C. § 554.

On March 1, 1905, the Secretary of the Interior promulgated certain regulations under Section 4 of the Act of 1905, which were first published at 33 Pub.Land Dec. 451–453 (1905) [2] Volume 36, pp. 584–86, De-

---

1. Under the Act of 1905, Para. 5, 33 Stat. 628, 16 U.S.C. § 524, this obligation was transferred to the Secretary of Agriculture.

2. The regulations published in 1905 state in pertinent part:

1. This act grants right of way through forest reserves to citizens and corporations of the United States for the objects therein specified, during the period of their beneficial use, under rules and regulations to be prescribed by the Secretary of the Interior and subject to the laws of the State or Territory in which said reserves are respectively situated. •

All applications for the right of way for the purposes set forth in said act, must be submitted thereunder in accordance therewith, ...

2. The right granted is not in the nature of a grant of lands, but is a base or qualified fee, giving the possession and right of use of the land for the purposes contemplated by the act during the period of the beneficial use. When the use ceases, the right terminates, and thereupon proper steps will be taken to revoke the grant.

No right whatsoever is given ... to use any land outside of what is actually necessary for the construction and maintenance of the works.

3. Applications for right of way under this act should be made in the form of a map and field notes, in duplicate, and must be filed in the local land office for the district in which the land traversed by the right of way is situated; .... The maps, field notes, ... must be prepared and filed in accordance

cisions Relating to the Public Lands (1908), with only slight variation, and subsequently amended by the Department of Interior circulars.[3]

### Denver's Application for a Right-of-Way Under the 1905 Act

The City and County of Denver, acting by and through its Board of Water Commissioners, initiated its survey for the Williams Fork Diversion Project on March 21, 1914, and completed the survey on September 1, 1921. The noted and distinguished engineer and surveyor, George M. Bull, conducted the survey during a period of seven and one-half years. At trial, testimony was heard and I find that the survey was "an excellent survey," definitely relocatable which "[c]ould be put back upon the ground with the accuracy of the original survey." Such accuracy was tested by running all of the bearings and distances stated in Bull's field notes through a computer and determining the amount of misclosure, which "is the only way that relative accuracy can be expressed."

After completion of the survey work, Denver submitted its initial filing for a right-of-way across national forest lands for its Williams Fork project on February 11, 1922, under the Acts of March 3, 1891, 26 Stat. 1101, 43 U.S.C. §§ 946–49; May 11, 1898, 30 Stat. 404; and February 1, 1905, 33 Stat. 628, 16 U.S.C. § 524. On June 13, 1923, the General Land Office of the Department of the Interior denied the initial filing due to its submittal under all three of the above referenced Acts.

Denver submitted an amended filing on December 12, 1923, under only Section 4 of the Act of 1905. The amended filing consisted of a map and plat showing the location of certain proposed tunnels and canals of Denver's Williams Fork project and accompanying field notes. The field notes accompanying the final application stated that "[t]he center lines of canals and tunnels were staked; angles being turned by

---

with the then existing regulations, under the general right of way act (for present regulations see paragraphs 4 to 23, inclusive, circular of June 26, 1905), . . .

\* \* \* \* \* \*

6. . . .
No construction can be allowed on the reservation until an application for right of way has been regularly filed in accordance herewith and has been approved by the Department, or has been considered and permission specifically given by the Secretary of the Interior.
7. Upon the filing of an application under this act, the register will note the same in pencil on the tract books, opposite the tracts traversed giving date of filing and name of applicant, and also indorse on each map the name of the land office and the date of the filing over his written signature.
8. Upon the approval of a map of location by the Secretary of the Interior, the duplicate copy will be sent to the local officers, who will make upon the township plats the lines of the right of way as laid down on the map. They will also note the approval in ink on the tract books, opposite each legal subdivision affected, with a reference to the act mentioned on the map.
Paragraphs 4 to 23, inclusive circular of June 26, 1902, found at 31 Pub.Land Dec. 503–515 (1903) explicitly referred to in the 1905 regulations as equally applicable to rights-of-way issued under the Act of February 1, 1905, are quite specific and detailed with regard to, *inter alia*, the surveying techniques, procedures, and requirements necessary for the issuance of a right-of-way under the Act. In essence, these requirements called for a survey "so complete that from it the surveys could be accurately retraced by a competent surveyor with proper instruments. . . . The line of survey should be that of the actual location of the proposed ditch. . . ." The survey was even to "state which line of the canal was run—whether middle or a specified side line." Circular of June 26, 1902, at 511, ¶ 8. "The map [was to] bear a statement of width of each canal [or] ditch . . . if not of uniform width, the limits of the deviations from it must be clearly defined on the map. The field notes should record the changes in such a manner as to admit of exact location on the ground. In the case of a pipeline, the diameter of the pipe should be stated." *Id.* at ¶ 19.

**3.** On May 24, 1916, in Circular No. 479, "Rights-of-Way Through Unspecified Lands," 45 Interior Dec. (1917), the Secretary amended the above-noted regulations by stating: "Rights of way through unsurveyed lands—Maps showing . . . canals, water plants, etc., wholly upon unsurveyed lands, will be received and acted upon in the same manner hereinbefore prescribed for surveyed lands." I note that the Williams Fork project was on unsurveyed lands.

Buff and Berger transit reading to minutes at every station, distances being measured by stadia and grades set by level and rod. Solar observations taken daily."

George M. Bull, the engineer employed by Denver to conduct the survey for its Williams Fork project, stated on the amended filing that "said survey accurately represents a proper gradeline for the flow of water which is the proposed line of said canals and that said survey is accurately represented upon this map and by the accompanying field notes; . . . ." Frank L. Woodward, the then president of the Denver Water Board, stated on the amended filing that:

> the survey of the said canals and tunnels as accurately represented on this map and by the accompanying field notes was made under the authority of [the] Board; . . . [and] that said canals, tunnels, etc., as represented on this map and by said field notes were adopted by [the] Board by resolution on the 3rd day of May, A.D. 1921, as respective locations of the said canals and tunnels as described. . . .

As written and submitted to the Secretary of the Interior, the amended application specifically called for a gravity flow system utilizing canals and tunnels.

On May 5, 1924, the Secretary of the Interior approved the amended filing in accordance with Section 4 of the Act of 1905, subject to certain stipulations between the United States Forest Service and Denver. Denver thereby obtained a right-of-way across national forest lands, subject to beneficial use and the regulations of the Department of the Interior, such right-of-way being identified as Denver [or D]-027915.

### Construction on the Right-of-Way: 1924–78

On June 28, 1929, after five years of inactivity upon the right-of-way, the Department of Interior, through the Commissioner of the General Land Office directed the Register of the Denver, Colorado, District Land Office to notify Denver to file proof of construction of the Williams Fork project. The letter stated, *inter alia* :

There has been no evidence of construction filed in this office and while the act under which the grant was approved makes no provision for construction within a specified period of time, in view of the fact that the act of March 3, 1891, granting rights-of-way for irrigation projects and the act of March 3, 1875, granting rights-of-way for railroad purposes both provide for construction within five years from date of approval, five years is deemed a reasonable period of time within which to construct and put to beneficial use any project approved under said act of February 1, 1905.

The commissioner directed that Denver file proof "showing the project to be constructed . . . and [that it] is now being devoted to beneficial use or relinquish the [right-of-way] grant or show cause why this office should not recommend the cancellation of the grant by judicial proceeding."

On July 26, 1929, Denver filed its "Answer Showing Cause Why Cancellation of the Grant Herein Should Not be Recommended." Denver's answer was accepted by the Commissioner of the General Land Office and further action looking toward cancellation of the 1924 grant was suspended until January 1, 1931. Denver did not seek, and has not sought, any administrative or judicial review of the Department of Interior's decision that five years was deemed a reasonable period of time within which to put to beneficial use any right-of-way approved under the Act of 1905.

Beginning with the 1929 show cause report referenced above, the Department of the Interior made periodic requests that Denver show cause why cancellation of the 1924 right-of-way should not be recommended and Denver responded in each instance by filing a report. These documents were reviewed by the Department of the Interior and the Forest Service, with the Department of the Interior suspending further action regarding cancellation of the right-of-way for an additional period of time. This procedure continued until December 30, 1976, when Denver filed its thirty-seventh document. These "progress re-

ports" were not required under the Act but were accepted as responses to the Department of Interior's "show cause" requests why the right-of-way should not be suspended.

Actual construction of the Williams Fork project did not begin until 1937, culminating in 1942 with completion of a three-mile tunnel and partial completion of two conduits. This construction consisted of the Gumlick (Jones Pass) Tunnel and a collection system from the mouth of the tunnel to McQueary Creek and from the mouth of the tunnel to Steelman Creek. The construction utilized buried steel conduit on a grade and center line alignment designed for utilization of conduit and different from that originally set forth on the survey map upon which the 1924 right-of-way was granted. Denver has indicated that the change in alignment was necessary because the survey alignment was "unbuildable."

During the 1937–1942 construction period, the Public Works Administration, directed by George M. Bull at that time, participated in the construction of the Williams Fork project. The PWA was created under the Emergency Relief Appropriation Act of 1935 for the purpose of employing the unemployed and stimulating construction during the depression of the 1930's. Neither Bull nor the PWA had the power or duty to authorize the transfer of Forest Service lands or construction off Denver's original right-of-way. During this period the PWA allocated $1,230,750 for "aid in financing the construction of a sewage disposal system and appurtenances embracing a sewage treatment plant." The exact percentage of this funding spent on the construction of the conduits and other diversion work is unclear. However, with PWA financial assistance, approximately 15–17 percent of the total project as now envisioned by Denver was constructed.

In its seventh report dated June 26, 1941, Denver advised the Department of the Interior that installation of the first segment of the Williams Fork project had been accomplished utilizing steel cylinder pipe conduit, contrary to the specifications under the original right-of-way plan. Denver also advised the Department as follows:

> In the course of actual construction there have been certain slight changes in alignment of canals and in some cases distinct departures from the original plan for the sake of ultimate economy and efficiency in maintenance and operation. Denver is now preparing the necessary maps and other information for an amended application under the above serial number so that the final grant may be made by the United States of America as to those portions of the project which have been completed. It is anticipated that it will be nearly a year before such amended application can be made ready.

By decision dated July 24, 1941, the General Land Office approved as satisfactory Denver's seventh report and suspended further action on the cancellation of the right-of-way until December 31, 1942. Although subsequent actions by Denver indicate that it intended to file an amended application, such application was never filed with the Department of the Interior.

Both a subsequent letter from Denver to the Office of the Register, District Land Office, Denver, Colorado, and its eighth report recognized deviations of the construction in location and mode of construction. The letter, dated February 5, 1942, from Glenn S. Saunders, an attorney for Denver, was in response to the Register's letter of February 3, 1942, directing Denver to file certain reports. The Saunders letter stated in part:

> We ... wish to advise that the subject-matter of this letter has been given serious consideration by us for several weeks. While a great deal of completed construction has been done, *a large portion of it requires a resurvey because actual construction did not occur exactly as originally proposed.*

(Emphasis added). The letter continued to assure the Office of the Register that a resurvey would be conducted and completed in the summer of 1942, or if such a resurvey could not be completed, a limited showing would be provided and a further extension requested.

The eighth report, dated December 29, 1942, and filed December 31, 1942, indicated to the Department of Interior that "[a]ctual construction of the canal line consisted of the installation of cylindrical steel pipe." This report was accepted as satisfactory by a decision dated November 30, 1943, by the Department of the Interior, through its General Land Office. Because of World War II, further action was suspended until February 1, 1944. In that decision letter, however, the commissioner noted that Denver had

> reported that the actual construction [had] necessarily deviated to some extent from the definite location as approved, for which a new survey and map is to be presented for approval. No action was taken on the reports so filed on December 31, 1942, and no subsequent report has been submitted by the grantee, showing the progress of construction. . . .

I find that the above-quoted portions of the letter were in response to Denver's reports of deviation from the original plan for the Williams Fork Project. The statements establish Denver's acknowledgment of the need for an amended application.[4]

By Denver's admission at trial, the Williams Fork project as constructed in 1942 and preceding years deviates as much as 1,800 linear feet and 65 vertical feet from the 1924 survey alignment. The Department of Interior or Forest Service had no knowledge of these deviations *during* the construction period. Denver, however, became aware of the deviations in location and mode of construction during the construction period. After notification of the deviation, the Department of the Interior informed Denver thirty-seven years ago that an amended application was necessary. Nonetheless Denver has never asked for any authorization from the Secretary of the

Interior or the Secretary of Agriculture to continue with its deviations as to location or mode of construction.

From 1942 to 1978 there was no significant construction on the Williams Fork project. On June 30, 1955, the portion of the project constructed in the years 1937–42 was conveyed by deed by the City and County of Denver to the City and County of Denver acting by and through its Board of Water Commissioners.

### The Blue River Decree

Pursuant to the "Blue River Decree," entered in *United States of America v. Northern Colorado Water Conservancy District, et al.,* Civ. Nos. 2782, 5016 and 5017 (D.Colo. 1955), the City and County of Denver has a priority date of 1921 in the waters of its "Williams Fork Diversion Unit." This decree was approved by congress in Section 11 of the Colorado River Storage Project and Participating Projects Act, Pub.L. 485, 70 Stat. 105, 43 U.S.C. § 620 et seq.

The Blue River Decree does not indicate any specific diversion points for the proposed and yet unbuilt portions of the Williams Fork project. The decree states that "[n]o part of this decree shall in any case be taken, deemed or held to confirm, impair, or in any manner affect any claim of right or property claimed or held by any person, . . . to any land. . . ." Blue River Decree, No. 657, pp. 1, 2 (1937). The decree further states that "[t]his decree shall [only]' be taken, deemed and held as determining and establishing the several priorities of right by appropriation to the *use of water.* . . ." *Id.* at 4 (emphasis added). At page 724 of the same decree the court stated that the "locations of the several points of diversion of the canals" either were located according to the same United States Location Monument Wilson used by George Bull in his

---

4. The only evidence suggesting that Denver represented itself to the Department of Interior as having constructed on its right-of-way is an affidavit, dated December 28, 1942, addressed to the Department stating that certain construction on the Williams Fork project had taken place between the years 1936 and 1942, and, *inter alia,* "that the constructed work . . . conformed to the map which received the approval

of the Secretary of the Interior on May 5, 1924. . . ." This same affidavit noted the deviation by the "installation of cylindrical steel pipe" contrary to the original plan submitted in 1924. I find that this affidavit alone does not negate the evidence that Denver was aware of its construction off its original right-of-way and that an amendment was necessary to continue to construct off the right-of-way.

survey for the subject right-of-way, or significantly, "ha[d] *no independent point of diversion of any stream.*" *Id.* at 724. As a matter of fact rather than as a matter of law this decree did not quiet title to any land or right-of-way granted to Denver under the Act of 1905 and the 1924 grant.

Developments After Passage of the National Environmental Policy Act of 1969 and the Federal Land Policy and Management Act of 1976

In 1969 congress enacted the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.,* which became effective January 1, 1970. NEPA, as the act is known, empowers the federal government to use all practicable means available to carry out the policies of protecting and preserving the environment. Beginning with its December 12, 1973, recommendation that Denver's Thirty-Fourth report dated December 29, 1972, be accepted, the Forest Service recommended such action "subject to compliance with the requirements of the National Environmental Policy Act...."[5] In his recommendation, the Regional Forester stated:

Field investigations by our personnel disclose that the western portion of the proposed project remains uncompleted and little if any of the accomplishment reported by the City is directly attributable to this [1924] right-of-way. However, we understand that the City is in the process of reevaluating its entire diversion system plan for this area and has, at the request of the Forest [Service], initiated an environmental study to assess the alternatives. In the meantime, they have agreed, and we concur, that further road construction or right-of-way clearing activities on this particular project will be deferred pending results of an anticipated Environmental Impact Statement,

which considers the Williams Fork Diversion system.

Denver's Thirty-Fourth report was accepted by the Department of the Interior on March 12, 1975.

As early as 1973, in reviewing Denver's reports, the Forest Service began to consider various alternatives to continued construction of the gravity-flow system on which construction had commenced in 1937. Denver began to conduct various design and environmental studies concerning the development of its water rights in the Williams Fork valley. Such studies and other planning activities were reflected in Denver's reports, commencing with its Thirty-Fifth such report, dated December 29, 1973. On August 24, 1976, Denver informed the Forest Service that additional alternatives to continuation of the past development of the Williams Fork project were under consideration. Discussions regarding these alternatives were held by the parties involved in this litigation from the fall of 1976 until this action was filed in 1979; the alternatives were first formerly proposed after the passage of the Federal Land Policy and Management Act of 1976.

The FLPMA, 43 U.S.C. §§ 1701 *et seq.,* was enacted by congress on October 21, 1976, providing in Subchapter V, 43 U.S.C. §§ 1761 *et seq.,* for rights-of-way concerning the public lands and national forest lands, and transferring to the secretary of agriculture the authority to grant, issue or renew right-of-way concerning national forest lands. Section 706(a) of the act, 90 Stat. 2793, repealed the Act of February 1, 1905, 16 U.S.C. § 524, but § 701, 90 Stat. 2786, expressly stated that "Nothing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act."

**5.** In reviewing the progress reports submitted by Denver, the Department of Interior General Land Office and/or Bureau of Land Management routinely requested the Forest Service to review the progress reports, comment thereon, and express any objection to suspension of action on the case by the Department of the Interior. The reports were reviewed by the Forest Service, comments were made thereon, and, through and including the decision by the Department of the Interior dated February 4, 1976, the Forest Service recommended that the reports be accepted and action on the proposed cancellation or relinquishment proceedings be suspended.

In response to this act Denver submitted two special use permit applications to the Forest Service on October 27, 1976. The first application related to various pumping, storage and conveyance facilities located outside the existing 1924 right-of-way. The second application requested a modification of the gravity-flow system as described in the original 1924 grant. During this period the State Director for the Bureau of Land Management and the Regional Forester had met with Denver to discuss the alternatives which were the subjects of the two special use permits. Denver continued to reassess its Williams Fork project and in its Thirty-Eighth progress report dated December 30, 1976, it noted that after three years its "environmental assessment of the Williams Fork Diversion Project was completed." It still had not decided, however, on the design and concept for the diversion project, completed plans for any particular alternative to the 1924 plan, or formally requested permission from the Forest Service to alter or amend the 1924 right-of-way.

Meanwhile the Department of the Interior and the Forest Service initiated plans to either secure an amendment from Denver to continue construction off its right-of-way and relinquish the unconstructed portion of the right-of-way, or adopt an alternative to the 1924 plan.[6] On May 9, 1977, defendant Dale Andrus, State Director of the Bureau of Land Management, issued to Denver a "Notice to Show Cause" requiring Denver to submit a satisfactory showing of why an order of suspension of the right to construct the remaining portions of the right-of-way D–027915 should not be issued. After discussing the special use permits which Den-

ver had filed on October 27, 1976, the document stated:

> At this time the Regional Forester believes that either of the two alternatives presented by the Special Use applications is superior, environmentally, to continued construction of right-of-way number D–027915. Consideration of the two Special Use applications has been delayed by the Forest Service pending completion of the Environmental Statement for the Williams Fork Land Management Plan. The Forest Service anticipates filing the draft environmental statement with the Council on Environmental Quality in October 1977, and the final environmental statement in July of 1978.

Andrus further noted that under the Act of 1905 rights-of-way were granted only for a period of beneficial use and that

> [h]olding a right-of-way grant for a period of over 50 years, with only a minor portion of the authorized facilities being constructed in the first 18 years, and no construction occurring in the last 33 years, is clearly not putting the right-of-way to beneficial use in a reasonable time. . . .

He indicated also that the granting of the special use permits would obviate the need for construction as planned under the 1924 grant. Andrus concluded that Denver had thirty days within which to submit a satisfactory showing to preclude the suspension of the right-of-way, that such a suspension would be terminated if a viable alternative were selected and that, in any event, a hearing would be allowed if an order of suspension were issued.

---

6. More specifically, on March 1, 1977, defendant Dale Andrus, State Director of the Bureau of Land Management wrote to the Regional Forester to propose a meeting "to discuss . . . a partial relinquishment of [Denver's] right-of-way." On April 11, 1977, the Regional Forester responded by first noting the receipt of the special use applications by Denver:

> The applications are for two water collection and transmission systems. One would eliminate the need for any extension of the water system authorized by right-of-way D–027915. The second would require a relatively minor extension of the water system authoriz-

ed. . . . Either of these alternatives appear to be superior, environmentally, to continued construction on the existing right-of-way.

The Regional Forester, however, pointed out that consideration of the permit applications would be delayed pending completion of the Environmental Statement for the Williams Fork Land Management Plan scheduled to be finished by July, 1978. He concluded by requesting that "the Bureau of Land Management take whatever steps are necessary to secure a relinquishment of the unconstructed portion of [the subject] right-of-way."

In its response, dated May 27, 1977, Denver indicated its position that the Department of the Interior had no authority to suspend its 1924 right-of-way grant and its apparent rejection of the two proposed alternatives embodied in its special use applications. Denver responded that the department had "over a great number of years" given agency recognition to the fact that Denver had never intended to abandon any portion of the right-of-way but rather had "tenaciously held all of [its rights] as a part of the water works system and plan of the people of Denver...." Further, Denver stated that it had filed the special use permits at the urging of the Forest Service "for other routes across Federal lands in the Williams Fork Basin" so that the Forest Service could consider them for "water works purposes in the development of a management plan for the Williams Fork Basin." Denver expressed surprise, however, that the special use permits were not being considered and that the Forest Service would interpret them as an implied intent to abandon the existing right-of-way. By letter of the same date, May 27, 1977, Denver communicated to the Forest Supervisor of the Routt National Forest[7] its intention "to move forward with completion of [the Williams Fork system] in the remaining portion of those lands [covered by the 1924 right-of-way] as rapidly as possible."

This decision by Denver to discontinue consideration of water diversion project alternatives was apparently prompted by its realization that the adoption of a new alternative would require amendment to its existing right-of-way and compliance with federal statutory and regulatory environmental standards. I note also that at this time the Department of the Interior and the Forest Service were unaware of the location deviations which occurred during the construction between 1937–42. Nevertheless, the two agencies gave confused responses to Denver's announced intention to continue construction on or, as the case may be, off its right-of-way.

The Forest Supervisor, Routt National Forest, in a letter dated June 8, 1977, refused permission for Denver to proceed with construction pending the resolution of a challenge to the validity of Denver's 1924 right-of-way in administrative proceedings before the Department of the Interior, of questions under federal law concerning the validity and width of the right-of-way claimed by Denver, and any necessary satisfaction of the provisions of the National Environment Policy Act and related Forest Service Requirements. Defendant Dale Andrus, however, having discussed the dispute with Denver's director, James L. Ogilvie, issued a letter dated June 21, 1977, to Mr. Ogilvie stating:

> [B]ased on your letter of May 27, 1977, and our discussions, it appears that the Board at this time is complying with the statutory authority under which the right-of-way was granted (Section 4, Act of February 1, 1905 (33 Stat. 628; 16 U.S.C. 524)). Of course, we reserve the right to re-evaluate the Board's compliance at reasonable intervals in the future. As agreed, re-evaluation will occur after the unit plan and environmental statement are completed by the Forest Service.

Regardless of the apparent inconsistent positions of these two federal agencies, Denver was aware that construction was to be delayed pending the outcome of environmental studies.

### Grand County Involvement in NEPA Scheme

At all times relevant to this action the lands upon which Denver intends to construct its Williams Fork Diversion Project have been lands lying wholly within the unincorporated territory of Grand County, except for the eastern segment of the Gum-

---

7. The administration of the Williams Fork area of the Arapahoe National Forest was transferred by the Regional Forester on April 1, 1973, to the Forest Supervisor, Routt National Forest, and the Middle Park Ranger District, Routt National Forest.

lick (Jones Pass) tunnel.[8] On December 14, 1973, an agreement entitled "Agreement for Land Use Planning Coordination" was entered into between the Forest Service and the County Commissioners of Grand County pursuant to the Multiple Use-Sustained Yield Act of June 12, 1960, 16 U.S.C. §§ 528–531, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* The agreement provides for cooperative planning efforts among Grand County, the United States Forest Service, and the Colorado Forest Service for activities on national and state forest and related lands within Grand County. It provides, *inter alia,* for cooperation in the preparation of "any environmental analyses or statements for any projects or activities as may be required pursuant to state laws and the National Environmental Policy Act (PL 91190)."

The testimony at trial showed that the Forest Service takes cognizance of Grand County's land use regulations and ordinances in the administration of the national forests located within Grand County. For example, in the issuance of special use permits, the Forest Service, as a matter of administrative practice, requires that a permittee abide by all laws, orders and regulations of state and local government. Grand County has adopted such regulations which will be discussed hereafter.

Administrative Decisions and Appeals

The Forest Service proceeded with the development of the Williams Fork Land Management Plan and the environmental statement concerning the plan during 1978.[9] In July, 1978, Denver began work on the Williams Fork project, completing a steel bridge and pioneering approximately four additional miles of road near the southeast end of Steelman Creek. The Forest Service then attempted to halt this construction. After a meeting on August 17, 1978, between Forest Service officials and Denver, the Forest Service informed Denver by letter dated August 23, 1978, that the 1924 "[g]rant provides a right-of-way on specified locations on National Forest land for only canals and tunnels as authorized in the amended filing map." and, since Denver was proposing closed conduit construction not included in the 1924 grant, that an application for a new or amended right-of-way was necessary. The letter directed Denver "not to begin any operations not specifically related to those facilities (canals and tunnels) authorized by the Grant."

Denver responded to the Forest Service in a letter dated October 6, 1978, stating that the Forest Service and the Department of Agriculture had no authority over its

8. The parties in their Pretrial Order conceded that none of the water collection features of the project will be constructed within the municipal boundaries of the City and County of Denver. Further, although Denver was unable to state what total quantity of water within its decree water rights will be diverted in any given year by the proposed Williams Fork Diversion Project, the water collected will be added to other water owned by Denver in its integrated water system and some of the water will be leased for use outside the municipal boundaries of the City and County of Denver. The Pretrial Order specifies that the Denver Water Board is not a public utility when it provides services to customers outside its municipal boundaries. Among Denver's distributor customers outside its boundaries are special districts with whom Denver contracts and will contract for the sale of the use of water from the Williams Fork Diversion Project, and which are not entities organized or existing pursuant to Article XX of the Colorado Constitution. For instance, the Wheatridge Water District and the Bancroft-Clover Water and Sanitation

District receive 100% of their water pursuant to service contracts entered into with Denver, and the Consolidated Mutual Water Company receives approximately 80% of its water pursuant to a service contract with Denver. These stipulations are not essential to a determination of the issues at bar and by this decision I do not intend to rule on any of the issues implicit therein.

9. On March 28, 1978, the Forest Service filed with the Environmental Protection Agency and made available to the public the Draft Environmental Statement for the Roadless Area Review and Evaluation, RARE II, which included Colorado Area 2–114, which itself includes the Williams Fork area at issue in this case. On June 28, 1978, the Forest Service filed with the EPA and made available to the public the Williams Fork Land Management Plan and the Final Environmental Statement concerning that plan. In that report the Forest Service stated: "[t]he existing right-of-way (easement) [held by Denver] is a legal encumbrance on the land."

1924 right-of-way, that the "canal versus conduit" distinction was artificial, and that Denver's construction activity was within the scope of the 1924 grant. Denver also said that continued construction along the right-of-way involved no substantial federal action or supervision, and that an environmental assessment was not required.

On October 6, 1978, the Regional Forester, Craig W. Rupp, requested Denver to submit complete plans for its continued construction of the Williams Fork project, both on and off the 1924 right-of-way, and a timetable for that construction, so that the Forest Service could adequately assess and evaluate any additional facilities that might be needed by Denver in order to install the project as described in the 1924 grant document. The Regional Forester also requested confirmation from Denver that all current work was specifically related to the authorized right-of-way. At this time the Regional Forester had knowledge of only the conduit deviation and not the alignment deviation which had occurred during the construction in 1937–42. By letter dated October 9, 1978, Denver informed the Forest Service that it had not yet developed complete plans for the Williams Fork project.

On October 19, 1978, the Regional Forester informed Denver that "to change from canals and tunnels to another structural form would require an amendment to the right-of-way" and that such amendment could not be accomplished under the Act of February 1, 1905, since that Act had been repealed by the Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. Denver was further advised that any change from the 1924 right-of-way could only be authorized after compliance with the National Environmental Policy Act and the FLPMA. The Regional Forester cautioned Denver that he was not requiring Denver to build canals and tunnels rather than conduits, but that he was requiring compliance with the FLPMA and NEPA regarding any change from the 1924 right-of-way as he was authorized to do under Subchapter V of the FLPMA, 43 U.S.C. § 1761 et seq.

Denver appealed the Regional Forester's October 19, 1978, decision on November 9, 1978, to John R. McGuire, Chief of the Forest Service. On December 11, 1978, the Regional Forester filed his Responsive Statement, which again concluded that the grant issued in 1924 was specifically limited to "canals" and "tunnels," and that construction of closed conduits would require amendment of the 1924 right-of-way and an environmental assessment. Denver replied to the Regional Forester's Responsive Statement on December 27, 1978. On February 13, 1979, Denver's appeal was denied by the Chief of the Forest Service for lack of timeliness. On March 5, 1979, Denver requested reconsideration. This request was denied on April 18, 1979. Therefore, the February 13, 1979, decision by John R. McGuire, Forest Service Chief, constitutes the final decision of the Department of Agriculture that the closed conduit construction is outside the scope of the 1924 right-of-way.

On December 4, 1978, Denver provided the Forest Service with additional partial plans and maps for the Williams Fork project. Denver also indicated that it would continue its practice of simultaneous planning and construction. It was upon the receipt of such plans and maps that the Forest Service realized that Denver had already constructed off the 1924 alignment. On January 5, 1979, while Denver's appeal on the question of closed conduit construction was pending, District Ranger Roger M. Corner informed Denver by letter that environmental damage was being caused by Denver's continued forest clearing and preliminary road construction and that Denver's map of October 12, 1978, showed that planned construction would take place a substantial distance off the 1924 right-of-way. Because of these concerns, the District Ranger directed Denver immediately to stop construction until measures could be taken to mitigate environmental damage and "until you can satisfactorily assure me that planned construction does not deviate from the approved right-of-way."

On January 12, 1979, the Regional Forester, Craig W. Rupp, supplemented and confirmed the District Ranger's January 5, 1979, letter and issued a formal Stop Order, ordering Denver to halt all new construction on the project until certain enumerated conditions were met. These conditions included, *inter alia*, the submission by Denver of complete plans for the Williams Fork project, resolution of whether those plans were "within the 1924 right-of-way grant you presently hold," and completion of an environmental assessment.[10] The order specifically required Denver to stop new construction until such has been "approved or authorized by *any and all Federal, State or County agencies* with jurisdiction...." (Emphasis added).

**10.** The Forest Service in issuing its stop order was apparently also concerned with the impact on Denver's construction on RARE II designated lands. On January 4, 1979, Secretary Bergland of the Department of Agriculture announced the Record of Decision for the Roadless Area Review and Evaluation RARE II, and the Final Environment Statement. The three possible designations for RARE II inventoried areas were (1) recommended wilderness designation; (2) further planning prior to possible recommendation for wilderness designation; and (3) non-wilderness designation. Although the right-of-way as specified in the 1924 grant document was excluded from Colorado Area 2–114 on the Colorado RARE II map, the area off the right-of-way and surrounding the right-of-way was designated as a further planning area.

**11.** Article 28, Title 30, Part I, Colo.Rev.Stat. 1973 authorizes counties in Colorado to conduct land use planning and to enact regulations in support thereof. In particular, Colo.Rev. Stat. § 30–28–102 provides:

*Unincorporated territory.* The Boards of county commissioners of the respective counties within this state are authorized to provide for the physical development of their unincorporated territory in the manner provided in this part I.

On February 15, 1979, the Grand County Regional Planning Commission adopted Resolution No. 1979–2–11. The Resolution amended and readopted the Grand County Comprehensive Plan, which consists of a base document and three major additions thereto: (1) The Three Lakes Plan; (2) The 208 Water Quality Plan; and (3) The Fraser Valley Comprehensive Land Use Plan. The Comprehensive Plan applies, by its terms, and as authorized by Colo. Rev.Stat. § 30–28–106 (1973), to all of the unin-

On February 5, 1979, the Commissioners of Grand County formally entered the picture. By letter of that date addressed to William Miller of the Denver Water Department the Board of County Commissioners of Grand County advised the department that before it could commence construction on the Williams Fork Diversion Project, it would be required to comply with the land use regulations of Grand County, *to-wit:*

(1) Grand County Comprehensive Plan, Grand County Resolution No. 1979–1–3, authorized by Article 23, Title 30, Colo. Rev.Stat. 1973 (as amended);[11]

(2) Grand County Zoning Regulations, Grand County Resolution No. 1978–6–4, authorized by Article 28, Title 30, Colo. Rev.Stat. 1973 (as amended);[12]

corporated territory of Grand County, Colorado. Pursuant to Colo.Rev.Stat. § 30–28–106, the Grand County Comprehensive Plan is a master plan, and deals with the subjects required by section 30–28–106(3)(a). The Plan forms the basis for implementing land use regulations such as the Grand County Zoning Regulations and Grand County Subdivision Regulations.

**12.** On September 4, 1979, the Grand County Board of County Commissioners adopted Resolution No. 1979–9–3, which amended and readopted the preexisting Grand County Zoning Regulations. The zoning regulations apply, by their terms and as authorized by Colo.Rev.Stat. § 30–28–102 (1973), to all of the unincorporated territory of Grand County, Colorado. The zoning regulations were adopted to implement the Grand County Comprehensive Plan, and *inter alia*, for the protection of the health, safety and welfare of the inhabitants of the County, all as required by Colo.Rev.Stat. § 30–28–101 *et seq.*

The Williams Fork Diversion Project allegedly is governed by the Grand County Zoning Regulations at sections I, II, VI, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII and XXIII. Specifically, the project is proposed to be located in the Forestry and Open Zoning District within the county. *See* Zoning Regulations, section VI. As a transbasin diversion facility it falls within the definition of the Regulations at section XI, subsection 11.-1(10)(a)(i). Such facilities are not within the category of "Uses Permitted" in the Forestry and Open District, but are listed as permissible in all zoning districts by special review. *See* section XI subsection 11.1(10). In order to obtain a permit to develop a transbasin diversion facility such as the Williams Fork Project,

(3) Grand County Subdivision Regulations, Grand County Resolution No. 78–4–5 and 77–12–20, authorized by Article 28, Title 30, Colo.Rev.Stat. 1973 (as amended); [13]

(4) Grand County Building. Code, Grand County Resolution No. 178–7–6,

the proponent of the project must make application to the county for a use permitted by special review, bringing into play the various sections of the zoning regulations listed above.

At section XI, subsection 11.1(10), the zoning regulations require submission of information regarding impacts of the proposed transbasin diversion project upon water rights, water quality, including salinity, or total dissolved solids (TDS), agricultural productivity, flooding activity, and significant environmentally sensitive factors.

13. On April 22, 1980, the Grand County Board of County Commissioners adopted Resolution No. 1980–4–4, which amended and readopted the preexisting Grand County Subdivision Regulations. The subdivision regulations apply, by their terms and as authorized by Colo.Rev.Stat. § 30–28–133 (1973), to all of the unincorporated territory of Grand County, Colorado, and were adopted to implement the Grand County Comprehensive Plan, the Grand County Zoning Regulations, and were designed for the protection of the health, safety, and welfare of the inhabitants of the County, all as required by § 30–28–101 *et seq.* and in particular by § 30–28–133.

Article I (Application of Regulations) of the subdivision regulations provides, at Section 1.5 (jurisdiction) that the regulations apply to any of the following activities within the unincorporated areas of Grand County, Colorado:

(a) Any division of lands into a subdivision as defined in Section 1.6(4) of these Regulations.

(b) Any resubdivision or replatting of a lot, tract or parcel of land.

Section 1.6(4) of the regulations defined "subdivision" or. "sub-divided land" in relevant part, as:

[A]ny parcel of land in the State . . . which is divided in two (2) or more parcels, separate interests, or interests in common. . . .

While residential development activity is usually the subject of subdivision review, it is the *actual dividing property in two or more parcels* which triggers specific application of the subdivision regulations.

At Article II, the subdivision regulations set forth required design standards, addressed to such topics, *inter alia*, as special site considerations (including the prevention of solid debris from being carried downstream, enlargement of a flood plain, or damage to lands other than those being proposed for development), streets, alleys and easements, dedications, and design

authorized by Article 28. Title 30, Colo. Rev.Stat. 1973 (as amended); [14]

(5) Grand County Administrative Regulations, pursuant to Resolution No. 78–5–4, authorized by Article 65.1, Title 24, Colo.Rev.Stat. 1973 (as amended) (H.B. 1041).[15]

standards for drainage, sewer and water, flood, fire, geologic and mineral resource areas.

14. Article 28, Title 30, Part II, Colo.Rev.Stat. 1973, authorizes counties in Colorado to adopt building codes for the protection of the health, safety, and welfare of their citizens. In particular, section 30–28–201, Colo.Rev.Stat. (1973), provides, in relevant part:

*Commissioners may adopt.* A board of County commissioners is authorized to adopt a building code in all or part of the county, and not embraced within the limits of any incorporated city or town. Such code shall provide for the regulation of the future construction or lateration of dwellings, buildings, and structures. . . . The requirements shall *be uniform for each class of dwelling, building or structure.*

On March 18, 1980, the Grand County Board of County Commissioners adopted Resolution No. 1980–3–1, which adopted the Grand County Building Code. The code is essentially the 1979 Uniform Building Code, with amendments specific to the county. The code applies, by its terms as authorized by Colo.Rev.Stat. (1973) § 30–28–201, to all of the unincorporated territory of Grand County, Colorado. Previous to this adoption, the county had adopted the 1976 Uniform Building Code, with amendments.

The code requires a permit from the building official for every building or structure constructed within the county. Grand County Building Code, Part I, Chapter 3, Section 301. A building is defined in the code as "any *structure used or intended for supporting or sheltering any use* or occupancy." Part II, Chapter 4, Section 403 (emphasis added). A structure is defined as "that which is built or constructed, an edifice or building of any kind, *or any piece of work artificially built up or composed of parts joined together in some definite manner.*" Part II, Chapter 4, Section 420 (emphasis added). The code contains extensive regulations pertaining to excavation, grading, construction *techniques, and quality and design of the materials used,* all to the satisfaction of the building official, before a building permit can be issued. *See* Chapter 17–46. In particular, the Code addresses building (Chapter 17), masonry (Chapter 24), concrete (Chapter 26), steel (Chapter 27), and excavation and grading (Chapter 70).

15. On May 16, 1978, the Grand County Board of County Commissioners adopted the Grand

By letter dated March 5, 1979, addressed to Mr. S. R. Broome, Grand County Manager, the Denver Water Department replied to the letter of February 5, and denied any obligation on the part of the Denver Water Department, to comply with Grand County Land Use Regulations, stating, *inter alia*:

> In light of the foregoing views and authorities, we are compelled to vehemently protest and object to any attempt by Grand County to impose the requirements of the regulations referenced in your letter to our Williams Fork construction activities except as to the building codes, as stated above.

No further action which might be pertinent to this litigation other than the independent Forest Service proceedings occurred regarding the application of the Grand County regulations to the Williams Fork Diversion Project.

On February 14, 1979, Denver appealed the January 12, 1979, order to the Forest Service Chief in Washington, D.C. The Regional Forester filed his responsive statement on March 14, 1979, and on April 2, 1979, Denver replied.[16] On May 8, 1979, the Forest Service Chief issued a decision affirming the January 12, 1979, order. In this decision, the chief stated, *inter alia*:

> Although the appellants argue that 'There is no deviation from the collection system concept . . .' there is a deviation from the location of the approved right-of-way. The deviation then, does require

consent of the agency (through the regional Forester).

With the passage of the Federal Land Policy and Management Act of 1976 (90 Stat. 2743) the Secretary of the Interior can no longer approve deviations from the right-of-way grant. That authority is now delegated to the Secretary of Agriculture when the right-of-way is on National Forest land.

\* \* \* \* \* \*

It is our decision that the appellants cannot resume work on the Williams Fork Collection System until the following conditions have been met.

1. Submission of plans for construction between Steelman Creek and Station 482 to the Regional Forester for approval:

2. Completion of an environmental assessment of the proposed construction that identifies and defines measures to mitigate environmental impact; and

3. Issuance by the Regional Forester of authorization to proceed with the proposed construction.

The decision of the Forest Service Chief constituted the final agency decision of the Department of Agriculture, subject to discretionary review by the secretary of that department. On May 23, 1979, the secretary indicated that he would not exercise such review.

County Administrative Regulations for Major Extensions of Existing Domestic Water and Sewage Treatment Systems by Resolution No. 1978–5–4. The administrative regulations were amended and readopted on August 21, 1979, by Resolution No. 1979–8–1. The administrative regulations were adopted under the authority, *inter alia*, of Colo.Rev.Stat. §§ 24–65.1–101 *et seq.*, and 29–20–101 *et seq.* *See* specifically §§ 24–65.1–101(1), 24–65.1–203, and 29–20–104. The regulations apply by their terms and as authorized by Colo.Rev.Stat. § 24–65.1–203, to the following "activities of state interest," within the unincorporated territory of the county designated by the Grand County Board of County Commissioners:

 (a) Site selection and construction of major new domestic water and sewage treatment systems (Regulations, at Chapter Three);

 (b) Site selection and construction of major extensions of existing water supply and sewage

treatment systems (Regulations, at Chapter Four); and

 (c) Municipal and industrial water projects (Regulations, at Chapter Five).

In order to receive approval under the regulations, a project proponent must make application to the Grand County Department of Development, receive advisory approval or disapproval from the Grand County Regional Planning Commission, and have its application granted by the Permit Authority after public hearing.

**16.** In March, 1979 the Commissioners of Grand County and the Sierra Club sought to intervene in the administrative proceedings concerning Denver's appeal of the January 12, 1979, order. Their intervention was granted on April 16, 1979.

Although final agency action regarding the use of closed conduits and construction off the 1924 right-of-way would appear to have settled the dispute, the parties continued to avoid a resolution of their disagreements. While the appeal to the Forest Service Chief was pending, Denver informed the Forest Service by letter dated April 20, 1979, of certain activities that it intended to commence on or around May 1, 1979. These included opening of the existing pioneer road, environmental monitoring, revegetation and a limited amount of minor construction activity. This letter was supplemented by a letter dated May 21, 1979, in which Denver indicated that it would also undertake certain geological and survey activities in preparation for further construction. Then, on May 23, 1979, Denver filed the present civil action seeking administrative review and quiet title decree to its right-of-way.

In response to Denver's May 21, 1979, letter, Forest Supervisor Jack Weissling, countered that it was apparent from discussions between Denver and the Forest Service that Denver's proposed activities would not be restricted to the 1924 right-of-way, and that a special use permit would be required for any activities beyond the right-of-way that involved surface or vegetative disturbance. Weissling warned that the Forest Service would not allow any activity "which might alter the wilderness character of the RARE II further planning area which is contiguous to your right-of-way grant." The Forest Supervisor requested that Denver "consider survey and drilling techniques which would minimize impacts on the further planning area," and provided Denver with the necessary special use permit application.

Denver countered the Forest Supervisor's letter by informing the Forest Service by letter dated June 20, 1979, that the work proposed by Denver would be "carried out on the Board's right-of-way, as constructed and as planned;" that "[t]hese activities will not involve structures, or soil and vegetation disturbances of any more than miniscule proportions;" and that, "[f]or these reasons, we must decline to file an application for any special permit and will proceed with the work outlined as soon as weather permits." Denver also indicated its intention "to proceed as soon as possible with the work of establishing the final grade of the Pioneer Road which has already been constructed."

Meanwhile, on June 12, 1979, the Forest Service Chief issued a revised decision of his May 8, 1979, decision affirming the Regional Forester's January 12, 1979, Stop Order.[17] The revised decision stated that Denver is required to provide to the Forest Service complete plans for the entire Williams Fork project; that, since the administrative record shows a deviation from the 1924 right-of-way, Denver "should submit to the Regional Forester for approval an application covering the complete plan for the proposed Williams Fork project." and that "[n]o activity is authorized on the proposed project unless such application is approved in accordance with Title V of the Federal Land Policy and Management Act;" that preparation of an environmental assessment will be required; that Denver must obtain any additional required federal or state authorizations; and that an assessment of the project's impact on the contiguous RARE II "further planning area" is also required.

The Department of Justice then entered the scene on June 28, 1979, by informing Denver "[t]o the extent your contemplated activities will occur or have effect beyond the limitation of the 1924 right-of-way, and pursuant to Forest Service regulations. 26

---

**17.** Both the Sierra Club and the Commissioners of Grand County, Colorado, in respective letters dated May 22, 1979, and May 30, 1979, requested clarification of the Chief's May 8, 1979, decision. It should be noted that the Sierra Club and the Commissioners of Grand County moved to intervene in this litigation, which was granted, on June 15, 1979. Upon a motion for rehearing by Denver, I again considered Grand County's motion to intervene, granting it as a matter of right on August 3, 1979. Grand County is an agency of the state of Colorado and is authorized, pursuant to Colo.Rev.Stat. § 30-11-101 *et seq.* (1973) to sue and be sued.

CFR 251.1 *et seq.*, the issuance by the Forest Service of a special use permit is absolutely required in this instance." Denver was further informed that "[w]ithout such permit process the Forest Service simply cannot make an intelligent determination of the adverse consequences upon National Forest lands as a result of Denver's proposed activities," and that "any activity by Denver beyond the limitations of the 1924 right-of-way will be considered a trespass upon federal lands ..."

Nevertheless, on July 9, 1979, at the site of project construction, Denver, without obtaining the additional authorization requested by the Forest Service and the Department of Justice, operated two bulldozers on the Pioneer Road of the Williams Fork project. As reflected in a memorandum dated July 16, 1979, and a letter dated July 17, 1979, from Forest Supervisor Weissling to Denver, both Weissling and District Ranger Corner were at the site of Denver's July 9, 1979, construction activity. They concluded at that time that the activity was in violation of the January 12, 1979, Stop Order and the June 12, 1979, revised decision of Forest Service Chief John R. McGuire. They also concluded that the construction was located beyond the 1924 right-of-way and constituted a trespass on federal lands and a violation of Forest Service regulations at 36 C.F.R. § 251 and 261. The Forest Supervisor and District Ranger therefore ordered that all work cease, and Denver halted its construction.

On July 10, 1979, Denver filed a motion for a temporary restraining order and preliminary injunction to prevent federal defendants from further interfering with Denver's construction activity. After a hearing on August 3, 1979, the motion was denied. At this hearing I also considered *ab initio* Grand County's motion to intervene formerly granted on June 15, 1979. I held that Grand County may intervene as a

party defendant as a matter of right pursuant to Fed.R.Civ.P. 24(a),[18] denied Grand County's motion for summary judgment, and granted the Mountain States Legal Services' motion for permissive intervention, dated August 1, 1979. Defendant Sierra Club was granted permission to intervene on June 15, 1980. On August 6, 1979, I granted the American Wilderness Alliance's Motion to intervene as a party defendant. In February and March, 1980 defendant federal government and defendant-intervenors Sierra Club and the AWA filed motions for summary judgment which were denied after hearing on April 24, 1980. Trial was then held in this case for six days, beginning on May 12, 1980. Extensive testimony was held and voluminous documents and records were filed with the court. All parties submitted post-trial briefs which numbered in hundreds of pages of proposed conclusions of law and fact and legal memoranda.

## II. CONCLUSIONS OF LAW

### Jurisdiction

Denver maintains this action as one seeking review of final administrative action by the United States Forest Service regarding Denver's location of and mode of construction on its 1924 right-of-way over national forest lands under 28 U.S.C. § 1331(a) and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* At the outset I note that Denver has also characterized this action as one to quiet title to its "property rights" pursuant to 28 U.S.C. § 2409a and as one seeking redress for an unconstitutional taking of its property in violation of the Fifth Amendment. I will first address these latter two bases for jurisdiction.

### Quiet Title Action

■ 28 U.S.C. § 1346(f) provides for exclusive jurisdiction in the district court over actions brought under section 2409a.

18. The commissioners claimed essentially two interests: full enforcement of federal environmental laws to protect their concern with the environmental and other consequences of Denver's activity, which will occur in Grand County, and with enforcement of their own police power regulations involving land use, construction permits and zoning. I asserted pendent jurisdiction over the state law claims, stating that if necessary I would certify interrogatories to the Supreme Court of the State of Colorado on matters of first impression.

However, I find that I have no jurisdiction under this statute as Denver has failed to state a claim upon which relief may be granted. It is settled that the United States is immune from suit absent its consent, *United States v. Sherwood*, 312 U.S. 584, 586–87, 61 S.Ct. 767, 769–80, 85 L.Ed. 1058 (1941), *Stubbs v. United States*, 620 F.2d 775, 779 (10th Cir. 1980), *S. J. Groves & Sons Co. v. United States*, 495 F.Supp. 201, 205 (D.Colo.1980). Congress may impose conditions on its waiver of sovereign immunity which must be strictly observed. *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957), *Stubbs v. United States*, 620 F.2d at 779. Congress waived sovereign immunity in suits against the federal government to quiet title but expressly conditioned that waiver.

In order for Denver to state a claim "[t]he complaint ... [must] ... set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property...." 28 U.S.C. § 2409a(c). Although a right-of-way, easement, implied easement of necessity or other "estate less than a fee simple" may properly be the subject of a quiet title action against the United States, *Kinscherff v. United States*, 586 F.2d 159, 160–61 (10th Cir. 1978), *See* H.Rep.No. 1559, 92d Cong., 2d Sess., *reprinted in*, [1972] U.S.Code Cong. & Admin.News, pp. 4547, 4552, the complaint must state with more particularity than Denver's claim to "whatever land is necessary in the Williams Fork Basin ... along an alignment comparable to and in general conformity" with the survey indicated on the 1924 application may. Particularity is required, *Buchler v. United States*, 384 F.Supp. 709, 712 (E.D.Calif. 1974), otherwise district courts would be empowered to quiet title to undefined lands.

Denver has admitted that it does not seek to quiet title to its original right-of-way under the 1924 grant but that it seeks title to some ill-defined public lands based upon adverse possession, a notion specifically rejected by Congress in 28 U.S.C. § 2409a(g) which states "[n]othing in this section shall be construed to permit suits against the United States of America based upon adverse possession." The forest lands off the right-of-way have not been deeded to the Denver Water Board, nor has Denver been given a right-of-way to use the lands off the 1924 right-of-way.[19] Thus this statute is an inappropriate basis for jurisdiction.

■ In addition, the statute of limitations imposed by § 2409a(f) bars an action by Denver. The twelve year limitation period begins to run on the date Denver knew or should have known of the "claim" of the United States. *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980); *Stubbs v. United States*, 620 F.2d at 779–80; *Amoco Production Co. v. United States*, 619 F.2d 1383, 1837–88 (10th Cir. 1980). *See also Hart v. United States*, 585 F.2d 1280, 1283–85 (5th Cir. 1978) *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *Grosz v. Andrus*, 556 F.2d 972, 974–75 (9th Cir. 1977); *Hatter v. United States*, 402 F.Supp. 1192, 1193–94 (E.D.Cal.1975). Denver knew or should have known that the federal government retained a claim of interest for the public in the forest lands off Denver's right-of-way during and after the construction ending in 1942. If a dispute to the "title" of that property or any other forest lands off the right-of-way existed, it should have been resolved within twelve years from that date. To allow an assertion of title now under section 2409a is inconsistent with congress' intent to prevent the bringing of stale claims against the government.

**19.** In its Proposed Conclusions of Law Denver seeks to quiet title to a "dominent estate" (sic) in the Upper Williams Fork Basin which it describes as "a continuation of the conduit and diversion work constructed ... in the 1930's in general conformity with the alignment and gradient so constructed, following the contour of the basin and intersecting Webb Creek, the Middle Fork of the Williams Fork River, and proceeding thence by a tunnel to intercept Allen Creek ... and concluding at the South Fork of the Williams Fork River." I find, however, that this description includes forest lands off the original right-of-way which are claimed by Denver under an adverse possession theory against the government and thus are not properly the subject of a quiet title action. 28 U.S.C. § 2409a(g).

## Unconstitutional "Taking" Claim

▮ Regarding Denver's claim that the federal government has taken its "property" rights in violation of the Fifth Amendment, the "Blue River Decree" (*United States v. Northern Colorado Water Conservancy District*, Civ. Nos. 2782, 5016, 5017 (D.Colo.1955), and the Act of Congress implementing that decree (43 U.S.C. § 620j, April 11, 1956, 70 Stat. 110), I find that I lack subject matter jurisdiction. Although I disagree with the description of this suit as a "taking" of property,[20] such a claim if pursued is properly within the jurisdiction of the Court of Claims. 28 U.S.C. §§ 1346(a)(2), 1491.[21]

▮ A claim "founded upon the Constitution" against the United States is within the jurisdiction of the federal courts under the Tucker Act. *United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946); *Whiskers v. United States*, 600 F.2d 1332, 1335 (10th Cir. 1979) *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *United States v. Wald*, 330 F.2d 871, 872 (10th Cir. 1964). Subject matter jurisdiction for an action alleging a governmental taking of property without due process of law in violation of the Fifth Amendment, where the amount in controversy exceeds $10,000, rests exclusively with the Court of Claims. *United States v. Causby*, 328 U.S. at 267, 66 S.Ct. at 1068. *See also United States v. Wald*, 330 F.2d at 872; *Smith v. United States*, 458 F.2d 1231 (9th Cir. 1972). The "property" involved here on which Denver seeks to develop its valuable water rights is clearly of value exceeding $10,000.00.

The claim advanced by Denver is more like one seeking possession of the right to use property[22] than one for just compensation for its taking. *See Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct.Cl.1976); *United States v. Northern Colorado Water Conservancy Dist.*, 449 F.2d 1 (10th Cir. 1971). If, however, Denver seeks to recover against the United States, it may pursue this claim only in the Court of Claims. *See United States v. Gregory*, 300 F.2d 11, 13 (10th Cir. 1962). Further, Denver may not present its claim as one for a declaration of its title to property off the original right-of-way and for injunctive relief to secure that title in order to escape the appropriate forum. *See Hoopa Valley Tribe v. United States*, 596 F.2d 435, 436 (Ct.Cl.1979); *S.J. Groves & Sons Co. v. United States*, 495 F.Supp. 201 (D.Colo.). I note that this court is empowered to grant only that relief to redress Tucker Act claims, i. e., money damages, as may be granted by the Court of Claims. *See United States v. Sherwood*, 312 U.S. 584, 590–91, 61 S.Ct. 767, 771, 85

---

**20.** More specifically, Denver claims that its recognized priority rights to the waters of the Williams Fork Diversion Unit constitute a recognition of its title to the initial phase of the Williams Fork project, including the forest lands off its original right-of-way. The Forest Service Stop Order, therefore, constituted a taking of its adjudicated right to title and vested property rights. I find that Denver's reliance upon the Blue River Decree and the Fifth Amendment is misplaced. The Blue River Decree represents in sum total an adjudication to the priorities for the usufructuary right to use certain waters. It in no way extends a right to title to forest lands upon which those waters run. The regulatory and police power action of the Forest Service to safeguard the national forests cannot be interpreted to constitute a taking of non-existent property rights off the original right-of-way. In *Utah Power and Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917), the Supreme Court rejected the notion that regulation of the occupancy and use of public lands consistent with its authority constitutes a taking of privately-held water rights. 243 at 404, 37 S.Ct. at 389.

**21.** 28 U.S.C. § 1346(a)(2) states in part that:
The district courts shall have original jurisdiction, concurrent with the Court of Claims, of ... [any] civil action or claim against the United States of America not exceeding $10,-000.00 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department....
28 U.S.C. § 1491 states in part that:
The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States of America founded either upon the Constitution, or any Act of Congress, or any regulation of any executive department.

**22.** I have already determined that a quiet title action is inappropriate in this case and that I am without subject matter jurisdiction to hear such a claim.

L.Ed. 1058 (1941); *Richardson v. Morris*, 409 U.S. 464, 465, 93 S.Ct. 629, 630, 34 L.Ed.2d 647 (1973). Thus, I conclude I am without subject matter jurisdiction to hear Denver's allegation of unconstitutional "taking" of its "property".

### Administrative Review

■ I find that jurisdiction exists under 28 U.S.C. § 1331(a) and the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*[23] There is a dispute among the circuits as to whether these two statutes taken together provide a jurisdictional basis to review agency action.[24] I conclude that jurisdiction is proper in this action to review the final agency decisions made by the Forest Service. In *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court held that although "the APA does not afford an implied grant of subject matter jurisdiction permitting federal judicial review of agency action," 430 at 107, 97 S.Ct. at 985, such was not necessary because section 1331 provided jurisdiction "subject only to preclusion-of-review statutes created or retained by Congress...." *Id.* at 105, 97 S.Ct. at 984. There is no statute that explicitly precludes judicial review of this matter. Thus jurisdiction lies. *Cf. Lee v. Blumenthal*, 588 F.2d 1281 (9th Cir. 1979) (district court limited in jurisdiction to review APA claim where existing limitation exists such as the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491);

*S.J. Groves & Sons Co. v. United States*, 495 F.Supp. at 205 (D.C.Colo.1980). *See also Watson v. Blumenthal*, 586 F.2d 925 (2d Cir. 1978).

As will be discussed more fully, *infra*, the Secretary of Agriculture and the Forest Service have acted in this matter regarding national forest lands pursuant to their authority under the Federal Land Policy and Management Act of 1976, Pub.L. 94–579 (1976), 90 Stat. 2744, 43 U.S.C. §§ 1701 *et seq.*, "to grant or *renew* rights-of-way over, upon or through lands within the National Forest System." 43 U.S.C. § 1761 (emphasis added). The FLPMA specifically provides for judicial review of "public land adjudication decisions." 43 U.S.C. § 1701(a)(6).

Although congress did not expressly waive sovereign immunity under section 1331, I find first that the federal question statute and the APA taken together provide a basis for jurisdiction to review this agency action and second that congress intended for sovereign immunity to be waived in situations such as this where aggrieved parties seek review of federal agency action. *See Jaffee v. United States*, 592 F.2d 712, *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Sheehan v. Army and Air Force Exchange Service*, 619 F.2d 1132, 1139 (5th Cir. 1980). It would be anomalous for judicial review of federal

---

**23.** 28 U.S.C. § 1331(a) provides that "[t]he district courts shall have original jurisdiction of all civil actions wherein the matter ... arises under the Constitution, laws, or treaties of the United States...." No jurisdictional limit exists in suits against the United States, or its agencies, officers or employees acting in official capacity.

5 U.S.C. § 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... is entitled to judicial review...." Sovereign immunity of the United States is waived in actions under the APA.

**24.** In *Watson v. Blumenthal*, 586 F.2d 925 (2d Cir. 1978), the Second Circuit held that § 702 and § 1331 taken together do not provide a jurisdictional basis to review agency action because although actions arising under federal statutes may be brought against the United States (§ 1331) and the APA waives the sover-

eign immunity defense of the United States in administrative review actions (§ 702), there is still no waiver of sovereign immunity under § 1331. *Id.* at 932. The APA waiver applies only where jurisdiction already exists. *Id.*

In *Jaffee v. United States*, 592 F.2d 712, *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), the Third Circuit held to the contrary stating that "section 702, when it applies, waives sovereign immunity in 'non-statutory' review of agency action under section 1331." *Id.* at 718. *Accord Sheehan v. Army and Air Force Exchange Service*, 619 F.2d 1132, 1139 (5th Cir. 1980). The Ninth Circuit has held that although section 702 is a waiver of sovereign immunity in actions against the government under section 1331, *Hill v. United States*, 571 F.2d 1098, 1102 (9th Cir. 1978), that waiver does not operate where existing statutes limit the district court's jurisdiction. *Lee v. Blumenthal*, 588 F.2d 1281 (9th Cir. 1979).

agency action to be unavailable in every situation because the APA provides no independent basis for jurisdiction and section 1331 provides no waiver of sovereign immunity. The result would be that no judicial review would ever be available. Were congress to intend such result its intention should be manifest.

### Jurisdiction Over State Claims

 At the hearing on August 3, 1979, I ruled that Grand County could intervene in this litigation as a matter of right. Rule 24(a) of the Federal Rules provides intervention of right if (1) [the party] claims as an interest relating to the property or transaction that is the subject of the action, and (2) [the party] is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest...." Fed.R.Civ.P. 24(a). I also ruled that I had pendent jurisdiction over the commissioners' state claims. Where the state and federal claims derive from "a common nucleus of operative fact," the court must consider matters of "judicial economy, convenience and fairness to litigants" in determining whether to exercise pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *Accord Sanchez v. Marquez*, 457 F.Supp. 359, 364 (D.Colo.1978). I find such to be the case here. Grand County's regulations are imminently at issue here as part of the federal environmental regulatory scheme. Its interests are affected by this litigation and its intervention does not impede the efficiency of adjudication of the issues.

### Authority of the Department of Agriculture and the Forest Service

The authority of the Secretary of Agriculture and the Forest Service to supervise and protect the national forest lands is beyond challenge. The Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S.Const. Art. IV, § 3, cl. 2. *See Gibson v. Chouteau*, 80 U.S. (13 Wall.) 92, 20 L.Ed. 534 (1872). *See also Kleppe v. New Mexico*, 426 U.S. 529, 535, 96 S.Ct. 2285, 2289, 49 L.Ed.2d 34 (1976); *Alabama v. Texas*, 347 U.S. 272, 274, 74 S.Ct. 481, 482, 98 L.Ed. 689 (1954); *Sabin v. Bergland*, 585 F.2d 955, 957–58 (10th Cir. 1978). This power granted to congress has been given an expansive interpretation by the courts. In *Kleppe* the Supreme Court indicated that the power over public lands is without limitation. 426 U.S. at 539–40, 96 S.Ct. at 2291–92. *Accord Jette v. Bergland*, 579 F.2d 59, 65 (10th Cir. 1978). A necessary ancillary to this power is the authority to "protect [public lands] from trespass and injury and to prescribe the conditions upon which others may obtain rights...." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1917).

 Congress may delegate these powers to control and protect the public lands to the executive. *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). *See also Best v. Humbolt Placer Mining Co.*, 371 U.S. 334, 336–338, 83 S.Ct. 379, 382–383, 9 L.Ed.2d 350 (1963); *Sabin v. Bergland*, 585 F.2d at 958. This power has been further delegated to the Department of Agriculture and its subagency, the Forest Service, pursuant to 16 U.S.C. § 551 which states that:

[t]he Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests ...; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; .... [25]

---

**25.** I note that section 551 was repealed by the Federal Land Policy and Management Act, Pub. L.No.94–579, § 706(a), 90 Stat. 2793 (1976) (no U.S.C. citation), insofar as it is applicable to issuance of rights-of-way. The statute granting authority to the Department of Agriculture regarding rights-of-way is now embodied in the FLPMA § 501, 43 U.S.C. § 1761.

I also note that in addition to 16 U.S.C. § 551 defendants cite 16 U.S.C. §§ 471 and 472 as

This statutory authority and duty of the Forest Service to protect the national forest lands from unauthorized use has been upheld by the Tenth Circuit. *See Sabin v. Butz*, 515 F.2d 1061, 1066 (10th Cir. 1975); *United States v. Hymans*, 463 F.2d 615, 617 (10th Cir. 1972). *See also Sabin v. Bergland*, 585 F.2d 955 (10th Cir. 1978) (Secretary of Agriculture has broad authority under related statute, 16 U.S.C. § 497, to protect national forests).

 In exercising its authority to control the national forest lands the Forest Service, under the supervision of and in conjunction with the Department of Agriculture, may issue stop orders against persons trespassing on national forest lands, including those performing construction on those lands without permission, 36 C.F.R. §§ 261.50(a), (b), 261.6, 261.9, 261.19(a),[26] and may grant special use permits for specified use on national lands which might be otherwise prohibited. 36 C.F.R. § 251.-1(b).[27]

The Forest Service does not have authority to interfere unreasonably with an existing right-of-way. Section 701 of the FLPMA, Pub.L.No.94–579, 90 Stat. 2743 (1976),[28] provides:

(a) Nothing in this Act, or in any amendment made by this Act shall be construed

as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act.

However, whereas the authority to issue and manage rights-of-way across the public domain including national forests had hitherto been the sole responsibility of the Secretary of the Interior, with the passage of section 501(a) of the FLPMA, 43 U.S.C. § 1761(a), that authority and responsibility for national forests and in this case the use of rights-of-way now rests exclusively with the Secretary of Agriculture. Section 1761(a) states:

(a) [T]he Secretary of Agriculture, with respect to the lands within the National Forest System, ... [is] authorized to grant, issue, or *renew* rights-of-way over, upon, under, or through such lands for—

(1) reservoirs, canals, ditches, ... tunnels, and other facilities and systems for the impoundment, storage, transportation, or distribution of water;

\* \* \* \* \* \*

(6) roads, trails, highways, ... and other means of transportation...; or

(7) such other necessary transportation ... which requires rights-of-way over, upon, under, or through such lands.

---

authority for the Forest Service's supervision of the national forests. Section 471 is inapplicable in that it was repealed by the FLPMA, Pub.L.No.94–579, § 704(a), 90 Stat. 2792 (1976) (no U.S.C. citation). Section 472 provides that "[t]he Secretary of the Department of Agriculture shall execute or cause to be executed all laws affecting public lands reserved under the provisions of section 471 ...," *i. e.*, existing forest lands. This statute along with § 551 and case law clearly support the authority of the Forest Service with respect to the national forest lands.

**26.** 261.50(a) provides:

The Chief, each Regional Forester, ... and each Forest Supervisor may issue orders which close or restrict the use of described areas within the area over which he has jurisdiction. An order may close an area to entry or may restrict the use of any area by applying any or all of the prohibitions authorized in this subpart or any portion thereof. Subsection (b) gives the officials the same authority to close or restrict the use of any forest

development road or trail within the Forest Service's jurisdiction.
Section 261.6 prohibits generally the cutting, destroying, and removing of timber; section 261.9 prohibits generally the destroying, disturbing, and removing of any property; and section 261.10(a) prohibits construction on national forest lands.

**27.** 36 C.F.R. § 251.1 provides

(b) *Special Use Permits.* (1) Special use permits shall be issued by the Chief of the Forest Service or, upon authorization from him, by the regional forester, forest supervisor, or forest ranger, ....
(2) Special permittees shall comply with all State and Federal laws and all regulations of the Secretary of Agriculture relating to the national forests and shall conduct themselves in an orderly manner.

\* \* \* \* \* \*

**28.** No U.S.C. citation. See note under 43 U.S.C. § 1701 entitled "Savings Provision."

*See also* section 510(a) of the FLPMA, 43 U.S.C. § 1770.[29]

 Therefore the Forest Service, as an agency of the Department of Agriculture has authority to determine if one is trespassing on national forest lands, and to issue special use permits to use those national forest lands or to grant amended rights-of-way or renew existing rights-of-way. In determining whether to renew a right-of-way the Secretary of Agriculture, acting through the Forest Service:

shall require, prior to ... renewing a right-of-way that the applicant submit and disclose those plans, contracts, agreements, or other information reasonably related to the use, or intended use, of the right-of-way, ... which he deems necessary to a determination, in accordance with the provisions of this Act, as to whether a right-of-way shall be ... renewed and the terms and conditions which shall be included in the right-of-way.

\* \* \* \* \* \*

I conclude that the Forest Service and the Department of Agriculture have authority to act regarding Denver's right-of-way.

Standard and Scope of Judicial Review of Forest Service Decisions

 Denver is essentially seeking judicial review of two agency decisions—the February 13, 1979, decision of the Forest Service Chief that the closed conduit construction is outside the scope of the 1924 right-of-way and that amendment to the right-of-way is necessary, and the June 12, 1979, revised decision of the Forest Service Chief affirming the January 12, 1979, Stop Order requiring Denver to discontinue construction off the location of the original right-of-way and on national forest lands until it achieves compliance with environmental planning requirements. The standard and scope of judicial review of this informal agency action is governed by the

APA which provides that agency decision must be sustained unless it is demonstrated to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. §§ 704, 706(2)(A), 706(2)(C); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *CF&I Steel Corp. v. Economic Development Administration*, 624 F.2d 136, 139 (10th Cir. 1980). Denver has recognized and conceded that the *Overton Park* standard is applicable here and it alleges that the federal defendants' actions were "arbitrary and capricious." My function in applying the arbitrary and capricious standard is to determine the authority of the agency, whether the agency complied with prescribed procedures in performing the actions in question, *id.*, whether the administrative decisions were based on a consideration of all relevant factors and whether there was a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823; *Sabin v. Butz*, 515 F.2d at 1067.

I have already determined that the Forest Service was within its statutory authority to make the decisions and to issue the stop order regarding changes in the mode and operation of construction on Denver's right-of-way where such affects national forest lands. I further find that the procedures followed by the Forest Service are proper in making decisions based upon its regulations. Neither rule-making nor action taken after an adjudicatory hearing is involved here. The Forest Service Chief and other officials acted properly within the scope of their authority. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823; *CF&I Steel Corp. v. Economic Development Administration*, 624 F.2d at 139.

In determining whether an agency decision or action is arbitrary and capricious, I am on one hand limited in my role and on the other hand required to engage in a

**29.** Section 1770 states in pertinent part:

Effective on and after the date of approval of this Act, no right-of-way for the purposes listed in this title shall be granted, issued, or

*renewed* over, upon, under or through such lands except under and subject to the provisions, limitations, and conditions of this title.

"substantial inquiry." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823. The arbitrary and capricious standard is highly deferential and presumes that agency action is valid. *Id.* I may not substitute my judgment for the agency, *id.* at 416, 91 S.Ct. at 823, and I must affirm the agency's decision if a rational basis is presented. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *CF&I Steel Corp. v. Economic Development Administration*, 624 F.2d at 139. However, I do not serve as a mere rubber stamp for agency decisions. Rather I must look at all relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823. "[T]he inquiry into the facts must be searching and careful ..." *Id.*

Defendants in this action have objected to my admitting into evidence exhibits which they claim are outside the two administrative records.[30] I agree that "the *focal point* for judicial review should be the administrative record already in existence, [and] not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (emphasis added). *See also Roberts v. Morton*, 549 F.2d 158, 160 (10th Cir. 1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). However, the Supreme Court has consistently expressed only that "ordinarily review of administrative decisions is to be confined to 'consideration of the decision of the agency ... and of the evidence on which it was based.'" *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (emphasis added) (*citing United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963). Then "[i]f the decision of the agency 'is not sustainable on the administrative record

made ... [the] decision must be vacated and the matter remanded ... for further consideration.'" *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. at 331, 96 S.Ct. at 582 (*citing Camp v. Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244). *See Security & Exchange Commission v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

However, it is also clear that in reviewing administrative decisions I may consider supplemental evidence, *i. e.,* testimony or exhibits, for explanatory purposes—"such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. at 143, 93 S.Ct. at 1244. *Accord, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 420, 91 S.Ct. at 825; *CF&I Steel Corp. v. Economic Development Administration*, 624 F.2d at 141. *See Also Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 480 (D.Kan.1978), *aff'd*, 602 F.2d 929 (10th Cir. 1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34–37 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *Asarco, Inc. v. Environmental Protection Agency*, 616 F.2d 1153, 1159 (9th Cir. 1980). While I am aware the additional explanatory material cannot constitute *post hac* rationalizations, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 419, 91 S.Ct. at 825, and I should uphold agency action on the basis of the reasons supplied by the Forest Service and not the court, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 286, 95 S.Ct. at 442; *Securities and Exchange Commission v. Chenery*, 332 U.S. at 196, 67 S.Ct. at 1577, I may uphold a decision of "less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 285–286, 95 S.Ct. at 441–442.

---

**30.** Defendants point out that of the total 136 exhibits offered by Denver in connection with the federal claims in this action, only ten are part of the two certified administrative records that were before the agency when it rendered its decisions in this case. However, I find that the exhibits and testimony admitted at trial are informational and aid me in determining whether the Forest Service did in fact consider all relevant factors and did not commit a clear error of judgment.

I note also that the standard of review of agency action alleged to be arbitrary and capricious is not simply whether there exists a rational basis for the action. Rather, the inquiry is "whether the decision was based on a consideration of *relevant factors*, whether there has been a *clear error of judgment* and whether there is a rational basis for the conclusions approved by the administrative body." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 285, 95 S.Ct. at 441 (emphasis added); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823. Therefore, I am not limited to the pristine original record when supplementary materials and testimony can aid me in understanding the issues. *Asarco, Inc. v. Environmental Protection Agency*, 616 F.2d at 1159–1160.[31]

The federal defendants correctly cite the Tenth Circuit's admonition in *Roberts* that judicial review under the substantial evidence standard of the APA, 5 U.S.C. § 706(2)(E), should be confined to the agency record and additional evidence excluded. *Roberts v. Morton*, 549 F.2d at 160.[32] In

**31.** Although I agree with defendants that the additional exhibits and testimony *in this* case do not change the outcome of this case I disagree that their admission and accompanying explanatory testimony was improper. I adopt the reasoning of the District of Columbia Court of Appeals in *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d at 36, that a "searching inquiry" into the administrative decision requires a consideration of all evidence submitted by the parties on review in special circumstances such as those presented in this case. In *Ethyl* the court stated:

There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in the most complex evidentiary matters; rather, the two indicia of arbitrary and capricious review stand in careful balance. The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made. The more technical the case, the more intensive must be the court's effort to understand the evidence, for without an appropriate understanding of the case before it the court cannot properly perform its appellate function. But that function must be performed with conscientious awareness of its limited nature. The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise. *Market Street Railway v. Railroad Commission*, 324 U.S. 548, 559–561, 65 S.Ct. 770, 776–777, 89 L.Ed. 1171 (1945). The immersion in the evidence is designed *solely* to enable the court to determine whether the agency decision was rational and based on consideration of the relevant factor. *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 285, 95 S.Ct. at 441. *Id.*

As the Ninth Circuit has further commented on this issue, "[i]t will often be impossible, especially when highly technical matters are involved for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco, Inc. v. Environmental Protection Agency*, 616 F.2d at 1160. I concur that I cannot adequately discharge my duty to engage in a "substantial inquiry" if I am required to take the agency's word that it considered all relevant matters. *Id.*

I also concur with the Ninth Circuit's reasoning that the court should be restrained in its approach in considering evidence outside the record. When the reviewing court finds it necessary to go outside the record, "it should consider evidence relevant to the substantive merits of the agency action only for background information ... or for the limited purpose of determining whether the agency considered all the relevant facts or fully explicated its course of conduct or grounds of decision." *Id.* After a careful study of the evidence, the court must then "step back" from the agency decision to exercise the narrowly defined duty in holding the agency to certain minimum standards of rationality. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d at 36. *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823; *Asarco, Inc. v. Environmental Protection Agency*, 616 F.2d at 1160.

**32.** The two provisions of 5 U.S.C. § 706(2)— "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] * * * (E) unsupported by substantial evidence"—are part of six which are "separate standards." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. at 284, 95 S.Ct. at 441; *Citizens to Preserve Over-*

*Roberts* the court rejected appellants' argument that summary judgment and dismissal on the pleadings was erroneous, finding that the evidence supporting the decision was substantial "when viewed in light of the entire record, including the body of evidence opposed to the agency's view." *Id.* That situation is different from the one here where highly complex matters are at issue and supplementary materials are necessary to educate me so that I can make an informed decision of review.

I note that in *Hallenback v. Kleppe,* 590 F.2d 852 (10th Cir. 1979), the Tenth Circuit accepted the district court's entrance of findings and conclusions in a judicial review of an administrative record, although there was no trial *de novo,* in order "to indicate how the court arrived at its conclusions and the operative facts for which it found that there was substantial evidentiary support." *Id.* at 855 n.3 (*citing Nickol v. United States,* 501 F.2d 1389, 1391 (10th Cir. 1974)). In *Hallenback* the court concluded that the agency had not acted arbitrarily or capriciously and that the agency action was based on substantial evidence. In a more recent Tenth Circuit case, *CF&I Steel Corp. v. Economic Development Administration,* 624 F.2d at 141, the court approved of the trial court's conduct of discovery beyond the administrative record by which plaintiff had sought to show fraud, bad faith or bias on the part of the agency—all explanatory discovery material within the *Overton Park* exception. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 420, 91 S.Ct. at 825.

■ Keeping all these principles in mind I am cognizant that if the Forest Service's inquiry was insufficient or inadequate and

the support for its decisions exiguous, I must remand the case and not "compensate for the agency's dereliction by undertaking [my] own inquiry into the merits." *Asarco, Inc. v. Environmental Protection Agency,* 616 F.2d at 1160. However, I find that based on the administrative records and with the aid of the supplemental informational evidence proffered by Denver, the Forest Service's actions were rational. The parties are correct in asserting that the central issue in this case is what Denver received in 1924. It is to this issue that I now turn.

### Denver's 1924 Right-of-Way Grant

■ The primary question in this case is the nature and scope of the interest that Denver received upon approval of its right-of-way application in 1924. The answer must begin with the language of the Act of 1905 itself:

> Sec. 4. That rights of way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, within and across the forest reserves of the United States, are hereby granted to citizens and corporations of the United States for municipal or mining purposes, ..., during the period of their beneficial use, under such rules and regulations as may be prescribed by the Secretary of the Interior, and subject to the laws of the State or Territory in which said reserves are respectively situated.

Act of February 1, 1905, ch. 288, § 4, 33 Stat. 628, 16 U.S.C. § 524 (repealed October 21, 1976, Pub.L.No.94–579, 90 Stat. 2793). The language of the statute, however, is only partly instructional. It does not speci-

*ton Park v. Volpe,* 401 U.S. at 413, 91 S.Ct. at 822. "[T]hough an agency's finding may be supported by substantial evidence, ... it may nonetheless reflect arbitrary and capricious action." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. at 284, 95 S.Ct. at 441. In *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), the Supreme Court defined "substantial evidence" in the context of court review of an administrative agency decision as " 'such relevant evidence as a reasona-

ble mind might accept as adequate to support a conclusion.' " *Id.* at 620, 86 S.Ct. at 1026 (*quoting Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. at 620, 86 S.Ct. at 1026.

fy the type of property interest which may be created in a right-of-way under the statute. It indicates that an interest exists only during the period of its beneficial use for the purpose indicated and "under such rules and regulations as may be prescribed by the Secretary of the Interior. . . ."

The legislative history of the Act provides additional help. The Conference Report on House Bill 8460 indicates that certain changes were made by the Senate and agreed to by the House conferees.

In section 4 insert the words "municipal or" before the words "mining purposes" in the fifth line; and in the eighth line strike out the words "Secretary of Agriculture" and insert in lieu thereof "Secretary of the Interior"; . . . .

\* \* \* \* \* \*

The effect of section 4 of the amendment as modified by the amendment agreed to by your conferees, changes the nature of the rights of way for the construction and maintenance of dams, reservoirs, water plants, ditches, flumes, pipes, tunnels, and canals, for municipal or mining purposes . . ., *during the period of their beneficial use*, and as amended *leaves the control of such grants and regulations with the De-*

*partment of the Interior, where the same now is.*

Conference Report, H.R.Rep.No.3975, 58th Cong., 3d Sess. (1905) (emphasis added). Congressman Lacy, a manager of the bill, explained the report as follows:

The next amendment is as to rights of way. The Senate made a provision that rights of way for ditches for mining purposes should be *in the nature of an easement instead of, as at present, a mere license.* The conference committee recommended that the section be amended by giving the same privilege to municipalities as is given to mining companies, because there are some towns which get their water power for electric lighting out of the ditches from forest reserves.

39 Cong.Rec. 1370 (1905) (emphasis added).[33] The history shows that rights-of-way granted under the 1905 legislation were in the nature of an easement.

Being "in the nature of an easement" does not mean that rights-of-way are exactly like an easement. Determining the exact character of rights-of-way for watercourses and for railroads has troubled the courts for years.[34] The railroad cases are illustrated

---

**33.** Reference to rights-of-way on forest lands having been previously "a mere license" may be in reference to the Act of February 15, 1901, ch. 372, 31 Stat. 790. In that Act, the Secretary of the Interior was authorized "under general regulations to be fixed by him, to permit the use of rights of way through the public lands, forest and other reservations of the United States. . ." for a number of different purposes. 31 Stat. 790. The Act states in part:

And provided further, that any permission given by the Secretary of the Interior under the provisions of this Act may be revoked by him or his successor in his discretion, and shall not be held to confer any right, or easement, or interest in, to or over any public lands, reservation, or park.

31 Stat. at 791. Specific reference was made to this Act in the initial regulations under the 1905 Act. Paragraph one of the regulations states:

All applications for the right of way for the purposes set forth in said act, must be submitted thereunder in accordance herewith, . . . . Where application is made for *permission* to use right of way for the purposes set forth in the act of February 15, 1901 (31 Stat. 790), the same must be submitted under said act. . . .

33 Pub.Land Dec. 451 (1905) (emphasis in original). The reference might also concern the Act of May 14, 1896, ch. 179, 29 Stat. 120, which amended the Act of March 3, 1891, ch. 561, 26 Stat. 1095, "to permit the use of a right of way . . . upon the public lands and forest reservations . . . for the purposes of generating, manufacturing, or distributing electric power."

**34.** I have found few cases in which there is anything more than a passing citation to the 1905 Act. *See e. g. Utah·Power & Light Co. v. United States,* 243 U.S. 389, 408, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *United States v. Henrylyn Irrigation Co.,* 205 F. 970, 972 (D.Colo. 1912); *Langdon v. City of Walla Walla,* 112 Wash. 446, 456, 193 P. 1, 7 (1920). While relevant to other questions, these cases do not discuss the nature of the interest granted under the 1905 Act. As a result, I have looked at analogous cases under similar right-of-way legislation. Most of the case law arises under the railroad acts or the watercourses right-of-way legislation, Act of March 3, 1891, ch. 561, 26 Stat. 1095, and its amendments. I find that these pieces of legislation are similar in important respects to that in 1905. Most important for the discussion here is the fact that both the

by *United States v. Union Pacific R.R. Co.,* 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957); *Great Northern Ry. Co. v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *Rio Grande Western Ry. Co. v. Stringham,* 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136 (1915), and *Northern Pacific Ry. Co. v. Townsend,* 190 U.S. 267, 23 S.Ct. 671, 47 S.Ct. 1044 (1903).

In *Townsend* the Supreme Court characterized a right-of-way under an early railroad act as "a limited fee, made on an implied condition of reverter," *id.* at 271, 23 S.Ct. at 672, and the court continued this characterization in *Stringham. Rio Grande Western Ry. Co. v. Stringham,* 239 U.S. at 47, 36 S.Ct. at 6. In the 1942 *Great Northern* decision the court found that the *Stringham* Court had relied on *Townsend* without recognizing certain changes in right-of-way legislation since 1871. *Great Northern Ry. Co. v. United States,* 315 U.S. at 274, 62 S.Ct. at 534. The court stated that a railroad right-of-way under an 1875 Act "grant[ed] only an easement, and not a fee [interest]." *Id.* at 271, 277, 62 S.Ct. at 532, 535.

In 1957 the cases were summarized by the Supreme Court in *Union Pacific* where the court stated that "[t]he most that the 'limited fee' cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes." *United States v. Union Pacific R.R. Co.,* 353 U.S. at 119, 77 S.Ct. at 688. This case law is reflected in Tenth Circuit decisions. *See, e. g., Energy Transp. Syst., Inc. v. Union Pacific R.R. Co.,* 606 F.2d 934, 936–37 (10th Cir. 1979); *Wyoming v. Udall,* 379 F.2d 635, 638–640 (10th Cir.), *cert. denied,* 389 U.S. 985, 88 S.Ct. 470, 19 L.Ed.2d 479 (1967). In *Udall,* the Tenth Circuit was "not impressed" with the problem of labels:

1905 Act and the 1891 Act use the same operative language—that is, that rights of way are "hereby granted" to certain parties for certain purposes.

**35.** I do not imply that all right-of-way statutes create the same sort of interest. The railroad cases indicate that early legislation may have made a grant of public lands and that later acts granted an easement. Some acts may grant

For the purposes of this case, we are not impressed with the labels applied to the title of the railroads in their rights-of-way across the public lands of the United States. The concept of "limited fee" was no doubt applied in *Townsend* because under the common law an easement was an incorporeal hereditament which did not give an exclusive right of possession. *With an expansion of the meaning of easement to include, so far as railroads are concerned, a right in perpetuity to exclusive use and possession, the need for the "limited fee" label disappeared.*

*Id.* at 640 (footnote omitted) (emphasis added).[35]

A similar pattern can be observed in the cases regarding rights-of-way for watercourses. In *Kern River Co. v. United States,* 257 U.S. 147, 42 S.Ct. 60, 66 L.Ed. 175 (1921), the court stated that a right-of-way under the Act of March 3, 1891, ch. 561, 26 Stat. 1101, as amended, "was neither a mere easement nor a fee simple absolute, but *a limited fee on an implied condition of reverter* in the event the grantee ceased to use or retain the land for the purposes indicated in the act." *Id.* at 152, 42 S.Ct. at 62, (*citing Rio Grande Western Ry. Co. v. Stringham,* 239 U.S. at 47, 36 S.Ct. at 6) (emphasis added). Some cases quote *Kern River* to characterize a right-of-way under the 1891 legislation as a "limited fee," *See e. g., Verde River Irrigation & Power Dist. v. Salt River Valley Water Users' Ass'n,* 94 F.2d 936, 940 (9th Cir. 1938); others characterize a right-of-way under the act as an easement, *See, e. g., Uhrig v. Crane Creek Irrigation Dist.,* 44 Idaho 779, 781, 260 P. 428, 430 (1927), *Whitmore v. Pleasant Valley Coal Co.,* 27 Utah 284, 285, 75 P. 748, 749 (1904); and at least one case discussing only a license, *see, e. g.,* Act of February 15, 1901, ch. 372, 31 Stat. 790, discussed at note 26, *supra,* and the nature of rights-of-way may vary according to the use for which they are granted. *See, e. g., Coulsen v. Aberdeen-Springfield Canal Co.,* 47 Idaho 619, 622–625, 277 P. 542, 544–545 (1929). It is this very indeterminate meaning of "right-of-way" that has caused problems.

both *Kern River* and *Stringham* stated that "[i]n any event it is a limited fee in the nature of an easement." *United States v. Big Horn Land & Cattle Co.*, 17 F.2d 357, 365 (8th Cir. 1927).

The most recent case that I have found that discusses a right-of-way under the 1891 legislation is *Wiltbank v. Lyman Water Co.*, 13 Ariz.App. 485, 477 P.2d 771 (1970), *petition granting review vacated*, 107 Ariz. 252, 485 P.2d 822 (1971). The Arizona court followed the "limited fee" concept in *Wiltbank*, at least in distinguishing the right-of-way from an ordinary easement. The court stated:

> In determining whether there is a right to inundate appellant's land under the "easement" the court must determine its nature. The defendant water company does not have an easement as the term is commonly understood; it has a limited fee which is a creation of the Congress of the United States. The limited fee has several definite characteristics. It is a right to use the surface of the land for a specific purpose. Such land has definite boundaries which must be recorded with the Federal Government. The limited fee cannot be conveyed to be used for any purpose other than that specified in the grant and cannot be taken by adverse possession for any other purpose. If the limited fee is abandoned or forfeited it can only be by virtue of Federal statute or regulation and the fee reverts back to the United States. The limited fee owner has a superior right to the surface of the land against anyone else. The limited fee is for railroads, pipelines, power plants, irrigation ditches and reservoirs, canals, etc. . . . .

13 Ariz.App. at 490, 477 P.2d at 774.

The first regulations under the 1905 Act were promulgated only one month after its passage, on March 1, 1905. The administrative view was that the Act did not make a grant of lands, but only "a base or qualified fee."

> 2. The right granted is not in the nature of a grant of lands, but is a base or qualified fee, giving the possession and right of use of the land for the purposes contemplated by the act, during the period of the beneficial use. When the use ceases, the right terminates, and thereupon proper steps will be taken to revoke the grant.
>
> No right whatever is given to take from any part of the reservation any material, earth, or stone for construction or other purposes, nor does it give any right to use any land outside of what is actually necessary for the construction and maintenance of the works.

33 Pub.Land Dec. 452 (1905).[36]

While the concept of a "limited fee" may have been useful in distinguishing a particular sort of right-of-way from an easement at common law, I question whether it has any continuing vitality, especially given the railroad cases. A right-of-way that is not a grant of lands is more like an easement than a fee. The answer is that the proprietor of the subject lands is also the sovereign and the right-of-way over the lands is a creation of positive law. The right-of-way granted to Denver under the 1905 Act is a right to use the surface of certain federal lands on a route approved by the federal government during the period of its beneficial use for the purpose originally granted.

Denver contends that the 1905 Act was an *in praesenti* grant of rights-of-way to those parties and for those purposes set out in the Act. Whether *in praesenti* or not, it is clear that the 1905 legislation was a general grant and that additional steps were necessary in order to realize the bene-

---

**36.** The federal defendants have referred to a Circular No. 108 issued by the Department of the Interior on May 7, 1912 which directed that certain changes be made in right-of-way regulations approved on June 6, 1908, and codified at 36 Pub.Land Dec. 567 (1908). The circular modified paragraph 38 of the regulations to state that the Act under which those particular paragraphs were promulgated "does not make a grant in the nature of an easement but authorizes a mere permit in the nature of a license. . . ." Paragraph 38 does not refer to the 1905 Act, but instead to the 1901 Act, discussed at note 33, *supra*. The regulations under the 1905 Act are at paragraphs 47 to 53 of the 1908 regulations.

fits of the Act and certain acts of beneficial use were necessary to retain the benefits realized. A similar characterization has been observed regarding other rights-of-way acts, most notably the Act of March 3, 1891. *See, e. g., Union Land & Stock Co. v. United States*, 257 F. 635, 638 (9th Cir. 1919); *United States v. Whitney*, 176 F. 593, 598 (D.Idaho 1910). In *Union Land* the Ninth Circuit stated that "the grant of rights [under the Act of March 3, 1891] is a general one. It opens the lands of the United States to the occupation of various and numerous applicants. By a general and permanent statute it provides the steps which they must take to acquire the rights contemplated by the grant." *Union Land & Stock Co. v. United States*, 257 F. at 638. A position similar to Denver's—that a right-of-way act made an *in praesenti* grant and vested a right-of-way without further action—was rejected in *United States v. Ickes*, 84 F.2d 228 (D.C.Cir.), *cert. denied*, 299 U.S. 562, 57 S.Ct. 24, 81 L.Ed. 414 (1936). In *Ickes* the court stated:

> The contention that the grant is one *in praesenti*, and therefore vests title in the applicant, irrespective of the approval by the Secretary of the Interior, cannot be sustained. So long as the exercise of the power of approval by the secretary is not unreasonable, or contrary to statutory mandates, governing the allowance of rights of way for canals and reservoirs, the jurisdiction of the secretary to act under reasonable regulations respecting such grants cannot be controlled by the mandatory orders of the courts.

*Id.* at 231.

The case law is clear that a right-of-way under the 1891 Act did not vest or accrue until a proper application was made and approval received—the application consisting of an endorsed map showing location of the proposed right-of-way and the accompanying field notes. *See, e. g., id., United States v. Tujunga Water & Power Co.*, 48

F.2d 689, 690–691 (9th Cir. 1931), *United States v. Big Horn Land & Cattle Co.*, 17 F.2d at 363–365, *Nippel v. Forker*, 26 Colo. 74, 77, 56 P. 577, 578–579 (1899). While it might be argued that the filing and approval requirements that are expressed in the 1891 Act are absent from the 1905 legislation, it is fairly clear that the two acts are similar and related. Both say that rights-of-way are "hereby granted" and both place responsibility for their administration with the Secretary of the Interior.[37] Given the absence of any express procedure for obtaining the act's benefits, it is reasonable to assume that congress was aware of the administrative scheme under the 1891 Act when it stated in 1905 that rights-of-way were granted "under such rules and regulations as may be prescribed by the Secretary of the Interior," who had been charged with administration of the earlier act for almost fifteen years. If that sort of legislative design is not altogether certain, there is no doubt that the secretary immediately began to administer the 1905 Act in a parallel fashion. The first regulations promulgated on March 1, 1905, incorporated nineteen paragraphs from regulations under the 1891 Act.

The 1905 regulations[38] required *inter alia* that applications for a right-of-way under the 1905 Act be made in the form of a map and field notes to be filed with the local land office. 33 Pub.Land Dec. at 452, ¶ 3. The map, field notes, evidence of water rights and articles of incorporation and proofs of organization were to be filed in accordance with existing regulations under the general rights-of-way act. *Id.*[39] Paragraph five of the regulations stated that when an application was made for a right-of-way for water plants "the location and extent of ground proposed to be occupied by *building, or other structures . . . , must be* clearly designated on the map and described in the field notes and forms by reference to course and distance from a corner of the

---

**37.** *See* note 34, *supra*.

**38.** *See* note 2, *supra*, Findings of Fact, for text of the regulations.

**39.** Those regulations, found at paragraphs 4 to 23, inclusive, Circular of June 26, 1902, called for specific survey techniques. *See* note 2, *supra*.

public survey." *Id.* at ¶ 5.[40] The applicant was also required to file an affidavit setting forth the dimensions and proposed use of each of the structures and a showing that each was necessary to the proper enjoyment of the right-of-way. *Id.*

The sixth regulation, *id.* at 453, required a stipulation, under seal, incorporating the conditions set forth in paragraph 3 of the Circular of June 26, 1902, *to-wit:*

(1) That the proposed right of way is not so located as to interfere with the proposed occupation of the reservation by the Government.

(2) That the applicant will cut no timber from the reserve outside the right of way.

(3) That the applicant will remove no timber within the right of way except only such as is rendered necessary by the proposed use and enjoyment of the privilege for which application is made, and that he will also remove from the reservation, or destroy, under proper safeguards as determined by this office, all standing, fallen, and dead timber, as well as all tops, lops, brush, and refuse cuttings on the right of way, for such distance on each side of the central lines as may be determined by the General Land Office to be essential to protect the forest from fire to the fullest extent possible.

31 Pub. Land Dec. 503, 506–507 (1903). The applicant was required to post bond to the United States stipulating that the applicant would pay to the United States for damage to the public lands, timber, natural curiosities, or other public property on such reservation or other United States lands by reason of the applicant's use and occupation of the right-of-way, regardless of the cause or circumstances under which the damage occurred. 33 Pub.Land Dec. at 453, ¶ 6. Further the regulation specifically stated that "[n]o construction can be allowed on the reservation until an application for right of way has been regularly filed in accordance therewith and has been approved by the

Department, or has been considered and permission specifically given by the Secretary of the Interior." *Id.* The final regulation stated that upon approval of the map by the secretary, the local land office would mark upon township plats the lines of the right-of-way as laid down on the map and note the approval in ink on the tract books with reference to the Act mentioned on the map. *Id.* at ¶ 8.

In *United States v. Henrylyn Irrigation Co.*, 205 F. 970 (D.Colo.1912), this federal district recognized the above procedure for obtaining a right-of-way under the 1905 Act and enjoined the construction of canals and tunnels on national forest lands. The court stated:

[I]t seems evident from the course of legislation affecting forest reserves that executive approval is necessary to the creation of irrigation enterprises thereon. Indeed, defendants tacitly admit this, in that they have applied for such approval. It does not seem necessary to quote or review in detail the various acts which converge to this result. Beginning with the act of March 3, 1891 (21 Stat. 1095, c. 561 [U.S.Comp.St. 1901, p. 1535]), and extending to that of February 5, 1905, (33 Stat. 628, c. 288 [U.S.Comp.St.Supp. 1911, p. 635]), the legislative intent is manifest that as to these reserves, created as they are for a special purpose, no occupancy nor use thereof by private parties shall be permitted save upon the exercise of a discretion by the proper departments as to whether such use will interfere with the purposes of such reserve. *U. S. v. Lee*, 15 N.M. 382, 110 Pac. 607.

*Id.* at 972.

The regulations in effect at the time of Denver's amended filing on December 12, 1923, are found at 36 Pub.Land Dec. 584 (1908), as amended by Circular No. 479 dated May 24, 1916, reported at 45 Pub.Land Dec. 91 (1917). Some point has been made that the 1924 right-of-way involved unsur-

---

**40.** I note again that Denver's right-of-way was on unsurveyed land but find that under the regulations in effect at the time Denver received its right-of-way the same procedures were followed as for rights-of-way on surveyed lands. *See* note 41, *infra*, and accompanying text.

veyed lands and under early regulations the approval procedure did not apply to such lands. *See, e. g.*, 36 Pub.Land Dec. 573, ¶ 17, 585, ¶ 53 (1908). The 1916 amendment reads:

> Regulation 53 of the circular approved June 6, 1908 (36 L.D., 567, 586), governing rights of way over public lands and reservations for canals, ditches, reservoirs, etc., under section 4 of act of February 1, 1905 (33 Stat., 628), is hereby amended to read as follows:
>
> *Rights of way through unsurveyed land* —Maps showing reservoirs, canals, water plants, etc., wholly upon unsurveyed lands, will be received and acted upon in the manner hereinbefore prescribed for surveyed lands.

45 Pub.Land Dec. 91 (1917). Accordingly, Denver's application for a right-of-way was subject to the same approval procedure, whether on surveyed or unsurveyed land.[41]

Clearly under the regulation the 1924 grant to Denver was not for some ephemeral project of unlimited proportions but was for specifically enumerated activities on the exact location as stated in both the application and the grant. In compliance with the strict and detailed surveying requirements found in paragraphs 4 to 23, inclusive. Circular of June 26, 1902, 31 Pub.Land Dec. at 503–515 (1903). George M. Bull performed an accurate survey for the proposed water project.[42] Denver fails to persuade in contending that the survey was preliminary and reconnaissance in nature. The Bull survey did locate the project's alignment and position, regardless of whether it was proper for a construction survey then or now.[43] Bull's maps and field notes were

41. *See also*, note 3, *supra*, Findings of Fact. I further note in passing that reserved lands are not "public lands." *See, e. g., United States v. McIntire*, 101 F.2d 650, 654 (9th Cir. 1939), *United States v. Lee*, 15 N.M. 382, 110 P. 607, 611 (1910).

42. Such accuracy was tested by running all of the data stated in the field notes through a computer to determine the amount of misclosure. The computerized results showed certain ratios of closure all of which were described by expert witnesses at trial as "incredibly good" and "quite good" even by today's standards. Arthur W. Hipp, a Forest Service and licensed Colorado surveyor in the profession for twenty years, testified that the survey was complete and represented all the necessary elements of a proper survey. He performed a mathematical check on the values represented in the field notes and found that using a standard of error termed "ratio of precision," the amount of closure was exceedingly good. Hipp took the Bull data and ran a bearing traverse on a programatic calculator, dividing the traverse into four logically-based closed loops and computing each separately. He repeated the test using more legible copies of the field transcript and field book and map coming up with the ratios: 1:28,000 down to 1:24,000, or an "actual linear error of closure [of] 1.43 feet:" 1:17,000 up to 1:18,000, or "actual linear [error of] closure being 2.24 feet:" 1:7,400 down to 1:5,200 "with an actual error of closure of 11.46 feet:" and 1:3,800 down to 1:2,000 for a "very long loop . . . with the actual linear misclosure error . . . [being] 39.5 feet." The practical significance of the ratios is that the surveyor assigns a value to an original station, proceeds through the long tie and then along the appropriate sta-

tions, and then to the original station. By closing the long tie the surveyor comes back to the original point or fails to return mathematically to that point of origin by so many feet, *e. g.*, 1.43 feet.

Kenneth A. Witt, Chief of the Cadastral Study Branch of the Department of the Interior since 1968, with fifteen years in the surveying profession, ran a similar computer study and agreed with Hipp's mathematical findings and conclusions that the survey was excellent. Witt further agreed with Hipp that according to the field notes Bull used a procedure of carrying the true bearing on the plate of the transit and the angles were recorded in the form of a true bearing. The solar observations used by Bull were an accurate method for determining the true bearing and Bull's use of magnetic bearings was an appropriate check on the true bearing and was not necessarily evidence that the survey was only a "reconnaissance" rather than an actual construction survey. Further, Bull used eighteen individual identifiable points, any of which could be used as a starting point for the survey. He identified at least twenty-five prominent monument points in the field notes, although it appears he misnamed Pettingall Peak as Ptarmigan. Both Witt and Hipp concluded that the survey could be reconstructed. I find that the testimony by Denver's expert witnesses, John Land and William Teller, did not refute the fact that the survey was accurate.

43. Apparently the changes in construction in the late 1930's and early 1940's, by use of closed conduit rather than open canals, calls for a steeper gradient than Bull had laid out. The change in location also necessitates devia-

submitted for approval of a right-of-way application for the construction of said project. The application called for a gravity flow system utilizing canals and tunnels [44] and specified an exact location. Bull swore that the "said survey accurately represents a proper grade line for the flow of water which is the proposed line of said canals...." The then-Denver Water Board President also swore to the application's accuracy. It was this and only this application that was approved by the Secretary of the Interior on May 5, 1924. The grant document does not, as Denver urges, represent a vague conceptual framework meant only to suggest and guide the future manner and location of construction.

■ I recognize as a matter of substantive law that any and all laws, statutes or regulations which either grant privileges or relinquish rights to federally-owned lands

"are to be strictly construed; or, to express the rule more directly, ... such grants must be construed favorably to the Government and nothing passes but that which is conveyed in clear and explicit language—inferences being resolved not against but for the Government." *Caldwell v. United States*, 250 U.S. 14, 20–21, 39 S.Ct. 397, 398, 63 L.Ed. 816 (1919). *Accord United States v. Union Pacific Ry. Co.*, 353 U.S. at 116, 77 S.Ct. at 687. *Andrus v. Charlestone Stone Products*, 436 U.S. 604, 617, 98 S.Ct. 2002, 2009, 56 L.Ed.2d 570 (1978); *Walton v. United States*, 415 F.2d 121, 123 (10th Cir. 1969). Any ambiguity or disagreement here must be resolved in favor of the government. I conclude that the application consisting of the plan and survey notes accurately depicted what Denver received in 1924.[45]

tion in construction from the original survey alignment. This ineluctable fact is manifestly why the parties are in dispute. However, the fact that construction may not continue effectively on the original alignment is not a *carte blanche* for Denver to use forest lands inconsistent with its original grant.

**44.** The regulations in existence in 1905 and carried forward in 1908 noted specifically that "[t]he map bear a state of the width of each canal, ditch.... The field notes should record the change in such a manner as to admit of exact location on the ground. In the case of pipe line [*i. e.*, conduits], the diameter of the pipe should be stated...." No such diameter was ever given by Denver, since only canals and ditches were contemplated by the parties at the time. Denver did, however, carefully describe the specific length, width and depth of the various sections of the proposed canals and tunnels:

1. NORTH CANAL LINE... 1.43 miles long, 6.0 ft. wide, 4 ft. deep....
2. SOUTH CANAL LINE... Sec 1 ... 0.24 miles long, 14.0 ft. wide, 6.5 ft. in depth ... Sec. 2 ... 1.47 miles in length, 11 ft. in width, 6 ft. in depth ... Sec. 3 ... 4.74 miles in length, 9 ft. in width, 5 ft. in depth ... Sec 4 ... 2.78 miles in length, 9 ft. in width, 5 ft. in depth ... Sec. 5 ... 0.89 miles in length, 7 ft. x 7 ft.... Sec 6 ... 0.41 miles in length, 8 ft. in width, 4 ft. in depth ... Sec. 7 ... 4.57 miles in length, 6 ft. in width, 4 ft. in depth ... TUNNEL...2.95 miles in length, 11 feet in width, 10 ft. in height....

**45.** I note as a peripheral matter that Denver is incorrect that Colorado common law controls

the determination of the scope and effect of the right-of-way interest. Where essential interests of the federal government are concerned, rights and liabilities under government grants are determined by federal law and not state law. *See, e. g., United States v. 93.970 Acres of Land*, 360 U.S. 328, 332–333, 79 S.Ct. 1193, 1195–1196, 3 L.Ed.2d 1275 (1959). Denver cites *United States v. Oklahoma Gas & Electric*, 127 F.2d 349 (10th Cir. 1942), *aff'd*, 318 U.S. 206, 63 S.Ct. 534, 87 L.Ed. 716 (1943), for the proposition that state law controls the determination of a right-of-way interest. *Oklahoma Gas & Electric* involved a totally different statute than the one in question here. The statute provided:

[T]he Secretary of the Interior is hereby authorized to grant permission, upon compliance with such requirements as he may deem necessary, to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation....

Act of March 3, 1901, section 4, 31 Stat. 1084, 25 U.S.C. § 311. Aside from the differing statutory language, the case is distinguishable because the Supreme Court ruled that the statute granting rights-of-way across Indian lands must be interpreted according to state law, "in the absence of any governing administrative ruling, statute, or dominating consideration of Congressional policy to the contrary." 318 U.S. at 210, 63 S.Ct. at 536. As demonstrated by the discussion above, it is manifestly clear that such a lacuna does not exist. State law does not apply in light of the Act of 1905 and the subsequent rules and regulations.

### Denver's Existing Rights in the Right-of-Way

The residual questions are what does Denver now possess and has it retained the benefits realized in 1924 by putting its right-of-way to beneficial use and by complying with federal and state law. Admittedly Denver constructed off its easement during the period from 1936–42 and changed the mode of construction. The Forest Service entered the picture when in 1978 Denver sought to continue its deviations in construction. Denver, as noted above, claims an indefinite right of usage on national forest lands. The federal government counters that Denver is in trespass and the right-of-way must be forfeited. Denver recounters that the federal government during the 1936–42 period acquiesced to Denver's unlimited right-of-way and thus the government is estopped from asserting any rights in its "right-of-way."

I have already determined that the right-of-way in which Denver has rights is at present only that which the 1924 grant document evidences. I conclude, however, that while trespass is perhaps a near-appropriate characterization of Denver's actions it does not trigger forfeiture nor does estoppel or laches run against the government in this instance.

### Forfeiture

The 1905 Act states that rights-of-way are granted for a particular purpose, during the period of their beneficial use and under the rules and regulations of the Department of the Interior. The 1905 regulations provide that the right granted gives "possession and right of use of the land for the purpose contemplated by the act during the period of the beneficial use. *When the use ceases, the right terminates, and thereupon proper steps will be taken to revoke*

*the grant."* 33 Pub.Land Dec. 451 (1905) (emphasis added). The Act itself does not indicate what period of time is sufficient to establish beneficial use nor does it prescribe procedures for revocation of a grant given failure to conform with the conditions of the grant.

However, on June 28, 1929, the Department of the Interior indicated to Denver that it had no proof of construction on its right-of-way and informed it that "five years is deemed a reasonable period of time within which to construct and put to beneficial use any project approved under said Act of February 1, 1905." [46] From that time and continuing until 1976, the Department of the Interior requested Denver to file proof of construction or to show cause why the office should not recommend cancellation of the grant by judicial proceedings. Denver obviously accepted the agency's determination and submitted the "show cause" reports periodically for forty-eight years,[47] which resulted in suspension of cancellation proceedings.

The federal defendants' position now is that Denver has forfeited its right-of-way by having failed to construct in a beneficially useful way and for constructing contrary to the purposes and approved alignment of the original grant. Further, the government contends that Denver is in trespass as to the constructed portion off the original right-of-way and also as to its original right-of-way because of its alleged abandonment. The government asserts, however, that it does not seek removal of structures built in 1937–42 or cessation of the use but rather it seeks only to prevent new and additional trespass. Notwithstanding its assertion, during March and April of 1977 the Bureau of Land Management and the Forest Service initiated attempts to se-

---

**46.** The five-year time period was adopted by the Department of Interior as a reasonable period to establish beneficial use because both the Act of March 3, 1891, granting rights-of-ways for irrigation projects, and the Act of March 3, 1875, granting rights-of-way for railroad purposes, provided for construction within five years from the date of approval in order to defeat an action of revocation.

**47.** Although Denver continued to submit "progress reports" after February 4, 1976, they were not accepted by the Department of the Interior and no further one year extension of the original suspension order has been given since that time.

cure relinquishment of the unconstructed portions of the right-of-way. Neither the Bureau of Land Management nor the Department of the Interior carried out any attempts to secure forfeiture by judicial proceeding. In fact the BLM's letter to Denver of June 21, 1977, indicated that according to Denver's representation, Denver was in compliance with its statutory authority under the 1905 Act. As noted before, the inconsistent communications of the BLM and the Forest Service are somewhat troubling as to their position regarding Denver's construction on its right-of-way. Nevertheless, the evidence shows that Denver is off its right-of-way. I find, however, that automatic forfeiture is not appropriate and further that neither the Department of the Interior nor the Forest Service may unilaterally declare relinquishment absent a judicial proceeding.

As discussed above, Denver's right-of-way is the right to use the surface of particular lands on an alignment approved by the Department of the Interior, during the period of its beneficial use, for the purpose of developing a water project. This right of use is conditional and is burdened by a reversionary interest in the federal government. In the context of rights-of-way granted for irrigation purposes under the Act of March 3, 1891, as amended by the Act of May 14, 1896,[48] the Supreme Court has held that cancellation or forfeiture is appropriate for failure to make beneficial use or for contrary use. *See, e. g., Kern River Co. v. United States,* 257 U.S. 147, 42 S.Ct. 60, 66 L.Ed. 175 (1921); *United States v. Whitney,* 176 F. 593 (D. Idaho 1910). Forfeiture has been allowed even though opponents have argued that construction which substantially complied with the original purpose or in accordance with the original alignment had occurred. *See, e. g., United States v. Big Horn Land & Cattle Co.,* 17 F.2d 357 (8th Cir. 1927); *United States v. Tujunga Water & Power Co.,* 48 F.2d 689 (9th Cir. 1931).[49] Of course, the 1891 Act specifically provided for forfeiture. This same procedure was instituted regarding rights-of-way under the 1905 Act and was consented to by Denver in its compliance by filing show cause reports.[50] It is consistent with the conditional and reversionary nature of the grants of right-of-way under the 1905 Act.

Forfeitures are regarded as harsh and oppressive and are not favored by the law. *Henderson v. Carbondale Coal & Coke Co.,* 140 U.S. 25, 11 S.Ct. 691, 35 L.Ed. 332 (1891), *cited in Union Land & Stock Co. v. United States,* 257 F. 635, 637 (9th Cir. 1919). *See also Carns v. Idaho Iowa Lateral & Reservoir Co.,* 34 Idaho 330, 202 P. 1071 (1921). Failure to perform the conditioned construction does not *ipso facto* divest the right of the grantee; the right granted can only be terminated by some legislative or judicial proceeding. *Id.* at 333, 202 P. 1073. *See also Wiltbank v. Lyman Water Co.,* 13

---

**48.** *See* notes 33 and 34, *supra.*

**49.** In *Big Horn* the court stated:

> We cannot agree with the finding of the trial court in its decree that 'the defendant and its predecessors in title, after they made this application for a right of way for a reservoir site and ditch, went out there and attempted in good faith to make the construction contemplated, and did construct a dam in substantial compliance with the proposal.' Indeed, we find no evidence of any attempt to comply with the proposal after the filing of the map with the Secretary of the Interior. They may have been in good faith when they made the survey and mapped the project, but as we read the Act of March 3, 1891, faith

will only avail the applicants to the extent of their works.

17 F.2d at 363. I, too, am hesitant to accept any good faith substantial compliance argument advanced by Denver. The evidence does not support a conclusion that Denver has diligently pursued the construction of this water project.

**50.** I note that the show cause procedure was utilized under the 1891 Act and judicially approved as an adequate process for determining when relinquishment was appropriate. *See Union Land & Stock v. United States,* 257 F. 635 (9th Cir. 1919). In *Union Land* the court also made clear that the grantee carried the burden to show cause or seek an amendment to its application for a right-of-way. *Id.* at 639.

Ariz.App. at 493, 477 P.2d at 777; *United States v. Whitney*, 176 F. at 595.[51]

The federal government had not at any time sought forfeiture of all or part of Denver's right-of-way by judicial proceedings.[52] It has claimed, however, that Denver abandoned or intended to abandon the unconstructed portion of its right-of-way by its filing a special use permit application in 1976 and by consideration of a pumping alternative to the originally planned project. However, by its admission, the government recognizes that such plans were held in abeyance pending consideration of the entire Williams Fork Project.

It is ludicrous for the government to suggest that Denver has abandoned all of its rights in the 1924 grant. Although Denver has completed only minimal construction, it has expended in excess of seven million dollars on development work related to the Williams Fork Diversion Project, some of which was expended on development work in the Williams Fork Basin. Abandonment is a question of intention, *Hurst v. Idaho-Iowa Lateral & Reservoir Co.*, 42 Idaho 436, 246 P. 23 (1926); Denver has manifested no

intention to relinquish its right-of-way. Negotiations have been conducted between Denver and the government to resolve its use of the right-of-way given the passage of years and changes in water use technology. Further, the government has accepted Denver's show cause reports for some fifty years. Although this does not estop the federal government, it does evidence both a recognition that Denver did not at any time relinquish its right-of-way and a preference on the part of the government of suspension of forfeiture and amendment to the original right-of-way grant over a judicially-obtained relinquishment.

Forfeiture would be improvident here; a simple, more expedient, and wise resolution of this whole issue requires a recognition by the government that Denver has a right to develop its water rights with all environmentally permissible uses of its right-of-way, and Denver's recognition that it must comply with environmental laws in order to continue and complete development of its water diversion project on a course inconsistent with its original grant of right-of-

**51.** In *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893), the Supreme Court stated regarding the railroad right-of-way act of March 3, 1875, 18 Stat. 482, 43 U.S.C. § 934 *et seq.*, that the Secretary of the Interior could not unilaterally revoke a previously approved right-of-way.

> As was said by Mr. Justice Grier in *United States v. Stone*, 2 Wall. 525, 535, 17 L.Ed. 765: "One officer of the land office is not competent to cancel or annul the act of his predecessor. That is a judicial act and requires the judgment of a court." *Moore v. Robbins*, 96 U.S. 530, 24 L.Ed. 848.

147 U.S. at 176, 13 S.Ct. at 274. The Act of 1875 also granted land to the railroads pursuant to reasonable regulation by the Secretary of the Interior. While reasonable regulation encompasses conditions upon the grant of federal lands, it does not contemplate expungement of the grant at the whim of a federal official.

**52.** There is some question as to how such forfeiture would be obtained given the repeal of the 1905 Act by the FLPMA. Certainly before the repeal, the government, through the Department of the Interior, retained a right to seek reversion for non-use or inconsistent use of the right-of-way. With the transfer of the authority to issue or reissue rights-of-way to the Department of Agriculture, 43 U.S.C. § 1761(a), it is assumed that the Forest Service

or Department of Agriculture could also maintain an action seeking forfeiture. After passage of the FLPMA only the Department of Agriculture, not the Department of the Interior, could further extend the period of time in which to put the right-of-way to beneficial use; such act is the functional equivalent of the reissuance of the right-of-way. Section 509(a) of the FLPMA, 43 U.S.C. § 1769(a), states that the Act does not have the effect of terminating any existing right-of-way although the "Secretary concerned may cancel such a right-of-way or right of use and in its stead issue a right-of-way pursuant to the provisions of this subchapter." Obviously this trade-off is what Denver and the government agencies initially contemplated, but which failed. I note as well that under the FLPMA, 43 U.S.C. § 1766, rights-of-way granted under the Act may be terminated for non-use, non-compliance, or abandonment after notice and administrative proceedings pursuant to the Administrative Procedures Act, 5 U.S.C. § 554. The five-year non-use rule is also adopted to create a rebuttable presumption of abandonment. Although this section is not applicable here, I believe it evidences a course of conduct expected of government officials and grantees regarding use and relinquishment of rights-of-way.

way. The Forest Service's stop orders in an attempt to discontinue the "trespass" on lands off the right-of-way and onto national forest lands was within its statutory authority, *see United States v. Henrylyn Irrigation Co.*, 205 F. 970 (D.Colo.1912),[53] and was a more appropriate remedial action to preserve the status quo pending an amended application by Denver than an action seeking forfeiture. Given the circumstances here and absent judicial proceedings seeking forfeiture, Denver's grant of a right-of-way remains intact as it existed in 1924.

### Estoppel

█ Denver contends that the federal government, more particularly the Bureau of Land Management and the Forest Service, acquiesced and consented to the construction off its original grant of right-of-way in the late 1930's and early 1940's and it therefore estopped from objecting to its construction of a water collection system upon a continuation of the alignment and gradient employed in the first segment of construction, in using the cut and fill method of construction, and in designing and using closed conduit for the continuation of the project. Specifically Denver makes two claims: (1) that the involvement of the Public Works Administration and George Bull, first as Colorado State Administrator and later as Regional Administrator of the Public Works Administration, constituted approval by the United States of its construction off the original right-of-way, and (2) because the government did not immediately stop Denver after the 1937–42 construction, seek forfeiture or demand an immediate amended application, the government cannot now impose some control over its project as to future location and mode of construction.

It is true that Denver utilized funding from the Federal Emergency Administration of the Public Works Administration to construct part of its project then titled "Municipal Sewage Treatment Works, City and County of Denver, Colorado." However, the participation of Bull and use of PWA funds does not amount to approval of Denver's deviation from the original grant. Bull was not acting on behalf of the United States to condone the unauthorized use of national forest lands; he had no authority to do so. The PWA was created to take persons off the relief rolls and put them to useful work. Its powers and duties in no way involved or contemplated transfer or disposition of national forest lands.

In *Utah Power & Light Co. v. United States*, 243 U.S. at 409, 37 S.Ct. at 391, a case involving public lands, the Supreme Court said that "the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Accord United States v. Browning*, 630 F.2d 694, 702–703 (10th Cir. 1980); *Albrechtsen v. Andrus*, 570 F.2d 906, 909–910 (10th Cir.), *cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978); *Atlantic Richfield Corp. v. Hickel*, 432 F.2d 587, 591–92 (10th Cir. 1970); *The Oil Shale Corp. [TOSCO] v. Morton*, 370 F.Supp. 108, 125 (D.Colo.1973).[54] In *Utah Power & Light*

---

**53.** In *Henrylyn* the district court enjoined an irrigation company from continuing with its construction of canals and tunnels on national forest lands pending approval of the company's application for a right-of-way under the 1905 Act. The court made clear that the legislative intent of the right-of-way laws was "that as to these reserves, created as they are for a special purpose, no occupancy nor use thereof by private parties shall be permitted save upon the exercise of the discretion by the proper departments as to whether such use will interfere with the purposes of such reserve." 205 F. at 972. Whereas Denver may have trespassed on lands off its original right-of-way, it has not done so on the lands on its right-of-way under some theory that it no longer has such right-of-way via abandonment.

**54.** *Utah Power & Light*, however, is not dispositive of the entire issue of estoppel although it is especially applicable to Bull's alleged approval on behalf of the United States of Denver's construction off the right-of-way. This case, like the cases of *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) and *United States v. San Francisco*, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940), is limited to situations where an agent of the United States gave erroneous or unlawful advice to the party seeking to assert estoppel.

the defendants argued that agencies of the forestry service and other officers and employees of the government, with knowledge that the defendants were completing the construction of power houses, transmission lines, and subsidiary structures and proceeding with the generation and distribution of electric energy—all inconsistent with its rights as granted under the Act of February 1, 1905—not only failed to object but impliedly acquiesced until after the works were completed and put into operation. Again the court indicated that "[a]s a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest." 243 U.S. at 409, 37 S.Ct. at 391. The court indicated that exceptions may be made under some circumstances, although they generally do not apply when the United States is seeking to enforce and maintain its policy respecting lands which it holds in trust for all the people. *Id. Accord Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 8–9, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam).

Regarding this last point and Denver's second claim, I am aware that the law is unsettled as to whether equitable estoppel is a viable doctrine against the government and if so under what circumstances. *See generally* Comment, *Emergence of An Equitable Doctrine of Estoppel Against the Government—The Oil Shale Cases*, 42 Colo. L.Rev. 433 (1975). Until recently it was rubric that the government cannot be estopped. *See Hansen v. Harris*, 619 F.2d 942, 948 (2d Cir. 1980), *Albrechtsen v. Andrus*, 570 F.2d at 910. However, the law

has changed, *see* K. Davis, *Administrative Law of the Seventies*, § 17.01, at 399 (1976), and the doctrine applied in cases "where justice and fair play require it." *United States v. Ruby*, 588 F.2d 697, 703 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). *See also United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970); *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973).

 In *Ruby*, the Ninth Circuit reviewed decisions since the *Utah Power & Light* enunciation of the general rule and concluded that exceptions do exist.

As applied to the government [the doctrine of equitable estoppel] requires a balancing test. On the one side, the court must weigh the tendency of 'the government's wrongful conduct ... to work a serious injustice....' Against this consideration, the court must balance the countervailing interest of the public 'not [to] be unduly damaged by the imposition of estoppel.' [*quoting United States v. Lazy FC Ranch*, 481 F.2d at 989].

588 F.2d at 703. The court noted that these policy factors may militate against estoppel even though the technical elements of the doctrine are present. The traditional elements of estoppel require that:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) The latter must be ignorant of the true facts; and

---

This rule is rooted in the doctrine of separation of powers, *i. e.*, a government official cannot act with authority he has not been given by the congress and the courts cannot thereafter sanction such conduct as lawful. *See* Comment, 46 Colo.L.Rev. 433, 442–444 (1975).

At trial evidence was offered demonstrating that Bull, as Denver's surveyor, originally set out a plan for open canals and later, when Bull was with the PWA, "called for conduit instead of open canals [which] called for a steeper gradient than [Bull] had laid out, and he knew these various details of the plan and approved them." If Bull in fact gave permission, ex-

pressly or implicitly, to Denver's actions fifty years ago, such permission is ineffectual; Bull was without authority. *See United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–1669, 91 L.Ed. 1889 (1947). In addition, even if Bull or agents of the Forest Service or the BLM at that time believed the deviated construction to be within the 1924 grant, such erroneous interpretation of the law under the Act of 1905 will not support estoppel. *See e. g., Automobile Club v. Comm'r*, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957); *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 384–385, 68 S.Ct. at 3.

(4) He must rely on the former's conduct to his injury.

*Id.* The Ninth Circuit, however, adopts the position that regarding the government the necessary elements must be modified to include "affirmative misconduct" in order to trigger estoppel. *Id.*[55] *See Santiago v. Immigration and Naturalization Service*, 526 F.2d 488, 591 (9th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). *Accord Hansen v. Harris*, 619 F.2d at 948. Therefore, along with the four traditional elements of estoppel the government must have acted with "affirmative misconduct" and the balance of justice must weigh in favor of the private party and not against the "public interest." Although the Supreme Court has not resolved the question of estoppel against the federal government, I am persuaded by the reasoning of the Ninth Circuit.[56] Having determined the legal elements to be applied, I conclude that estoppel does not run against the government in this case.

Under the first element, although Denver advised the Department of the Interior in 1941 of deviations in construction along the alignment and indicated that it would amend its application, it also submitted conflicting information in its affidavit dated December 28, 1942 stating that construction conformed with the approved map.[57]

Therefore, although Denver was not aware of a deviation in mode and location of construction, the government cannot be held to have been placed on notice of the actual deviations for purposes of estoppel absent a filing of an amended map and field notes. Clearly the government anticipated an amended application which resulted in its continued suspension of cancellation proceedings. It was not until late 1978 that the Forest Service and Bureau of Land Management had sufficient facts to know that the construction was on an alignment different from that authorized by the 1924 grant.

The evidence also supports a finding that the government did not intend to permit the deviations to continue. After being informed that the construction utilized conduits and a possibly deficient alignment, the BLM promptly informed Denver in 1943 that an amendment was necessary. The "show cause" reports were accepted with the expectation that Denver would file an amended application indicating further deviations in construction which might be necessary to complete the water diversion project. Such acceptance does not constitute approval of the deviations.

Under the third element Denver was not ignorant of its deviations or the necessary procedure to amend its application, but was

---

**55.** In *Immigration and Naturalization Service v. Hibi*, 414 U.S. at 8, 94 S.Ct. at 21, the Supreme Court passed on the resolution of whether affirmative misconduct was a necessary element of estoppel against the government. "While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy*, 366 U.S. 308, 314, 315, 81 S.Ct. 1336, 1340, 1341, 6 L.Ed.2d 313 (1961), no conduct of the sort there adverted to was involved here."

**56.** I also agree with the Ninth Circuit's position that determination of when estoppel is appropriate should not be based on the distinction between the government's "proprietary conduct" and "sovereign functions." *United States v. Ruby*, 588 F.2d at 703. The government's participation in activities of commerce normally conducted by private parties does not in itself subject it to treatment different than when it acts as sovereign. As Justice Frank- further stated in *Merrill*:

Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.... Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. at 384, 68 S.Ct. at 3. Truly one who deals with the government does so at his own peril. *Atlantic Richfield Corp. v. Hickel*, 432 F.2d at 592. However, as noted above, estoppel may now apply against the government in certain circumstances regardless of whether it acts in its proprietary or sovereign function. This is, I believe, the better rule.

**57.** *See* note 4, *supra*, and accompanying text.

negligent in taking steps to outline the necessary changes requiring approval and in obtaining such approval. The Forest Service, upon learning of the deviations, did not manifest an intention to permit further trespass. It issued its first stop order on January 5, 1979.

Under the fourth element, I find that the government's conduct was not such that Denver could have relied upon it to its detriment. The government never approved the deviation. Estoppel cannot be found where "actions complained of are a result of the complainant's own actions." *C.F. Lytle v. Clark*, 491 F.2d 834, 838 (10th Cir. 1974). Finally, the evidence in this case demonstrates no "affirmative misconduct," or any attempts by the Forest Service or the BLM after becoming aware of the facts "affirmatively to conceal or to misrepresent the true facts." *See United States v. Ruby*, 588 F.2d at 703–704.

Therefore, balancing the equities in this case and considering the constitutional precept that public lands are held in trust by the federal government for all the people and should therefore be protected from involuntary alienation, I conclude that estoppel does not apply and that the Forest Service was within its authority to protect the national forest lands by issuing the stop work orders.

### Application of Federal Environmental Laws

Until October 21, 1976, the enactment date of the FLPMA, rights-of-way issued under the 1905 Act and applicable regulations could be changed or amended upon application to and at the direction of the Secretary of the Interior. After October 21, 1976, the FLPMA, 43 U.S.C. § 1770(a), required that an application for change or amendment to a right-of-way issued under the 1905 Act be made to the Secretary of Agriculture.[58] The Secretary of Agriculture has authority under the FLPMA to renew or issue new rights-of-way; the granting of a change to an existing right-of-way is therefore the functional equivalent of a re-issuance. If Denver intends to continue its Williams Fork Project on an alignment different from the alignment of its original right-of-way grant, it must submit an amended application to the Forest Service. The Forest Service in reviewing Denver's application to use and occupy national forest lands not specified in the original grant must comply with the provisions of the National Environmental Policy Act of 1969 and the applicable NEPA regulations.

As the Supreme Court recently recognized in *Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), the National Environmental Policy Act of 1969 sets forth its purposes in "bold strokes." *Id.* at 349, 99 S.Ct. at 2236–37.

> The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; *to promote efforts which will prevent or eliminate damage to the environment* and biosphere and stimulate the health and welfare of a man; to enrich the understanding of the ecological systems and natural resources important to the Nation. . . .

*Id.* 42 U.S.C. § 4321 (emphasis added).

Sections 101(a) and (b) of NEPA articulate these purposes with even greater particularity:

> The Congress [in enacting NEPA] . . . declares that it is the *continuing policy* of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, *to use all practicable means and measures,* including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a) (emphasis added).

In order to carry out the policy set forth in this chapter, it is the *continuing re-*

---

**58.** *See* note 22, *supra*, and accompanying text for statutory language and discussion.

*sponsibility* of the Federal Government *to use all practicable means,* consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

2) assure for all Americans safe, healthful, productive and aesthetically and culturally pleasing surroundings;

3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b).

NEPA contains "action-forcing" procedures which will help assure that the policies of NEPA are implemented. *See* S.Rep. No.91–296, p. 19 (1969); *Andrus v. Sierra Club,* 442 U.S. at 350, 99 S.Ct. at 2337; *Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976). The Supreme Court has recognized that *one* of the procedures is an environmental impact statement (EIS) required in 42 U.S.C. § 4332(2)(C). *Andrus v. Sierra Club,* 442 U.S. at 350, 99 S.Ct. at 2337. Section 102, 42 U.S.C. § 4332, sets out this procedure:

The Congress authorizes and directs that, *to the fullest extent possible*: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes: ....

42 U.S.C. § 4332(2)(C). In addition to the EIS, however, NEPA provides for other measures by which an agency may consider environmental impacts. *See e. g.,* 42 U.S.C. § 4332(2)(A), (B), and (E). Subsection (2)(A) requires government agencies to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the

environmental design arts in planning and in decision making which may have an impact on man's environment." Subsection (2)(B) requires government agencies to "identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations." Most importantly, subsection (2)(E) requires an agency to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." These other measures are important in this case because Denver asserts that NEPA only comes into play where proposed major federal action significantly affecting the quality of human environment may be taken—action which Denver asserts is not required to be taken by the Forest Service here. I disagree, however, that the other provisions of NEPA are a nullity. While it is true that section 102(2)(C) requires that proposed major federal action precede the preparation of an EIS, the other "action-forcing procedures" of NEPA do not condition consideration of environmental impacts upon an agency's taking of proposed major federal action. Subsections (2)(A), (B), and (E) are clearly separate procedural requirements of NEPA. While the filing of an EIS may signify compliance with these requirements, see *Save Our Invaluable Land (Soil), Inc. v. Needham*, 542 F.2d 539, 542–543 (10th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 296, (8th Cir. 1972) *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973), the detailed analysis of an EIS may not be required.

At the outset I note that the threshold decision of whether an EIS need be filed lies with the agency. *Jette v. Bergland*, 579 F.2d 59, 62, 63 (10th Cir. 1978); *Westinghouse Elec. Corp. v. United States*

*Nuclear Regulatory Comm'n*, 598 F.2d 759, 778 (3d Cir. 1979); 40 C.F.R. § 1500.6(c). *See also Vermont Yankee Power v. Natural Resources Defense Council*, 435 U.S. 519, 550–555, 98 S.Ct. 1197, 1215–1217, 55 L.Ed.2d 460 (1978); *Kleppe v. Sierra Club*, 427 U.S. at 412, 96 S.Ct. at 2731. However, an EIS is clearly required only in the event of proposed federal action that has a significant impact on the environment. *Andrus v. Sierra Club*, 442 U.S. at 355, 99 S.Ct. at 2340; 40 C.F.R. § 1506.8(a).

The Tenth Circuit has applied a unitary standard, as opposed to a dual standard, in determining whether an EIS is required, i. e., federal action is "major" where it has a significant impact upon the environment. *Compare Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973); *Davis v. Coleman*, 521 F.2d 661, 673 n.15 (9th Cir. 1975); *Minnesota Public Interest Group v. Butz*, 498 F.2d 1314 (8th Cir. 1974) (en banc), *subsequent decision*, 541 F.2d 1292 (8th Cir. 1976) (en banc), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977), *with NAACP v. Medical Center, Inc.*, 584 F.2d 619 (3d Cir. 1978); *Hanly v. Mitchell*, 460 F.2d 640, 644 (2d Cir.), *cert. denied*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Scherr v. Volpe*, 466 F.2d 1027, 1032–33 (7th Cir. 1972). The Tenth Circuit's interpretation is consistent with the Council on Environmental Quality's (CEQ) definition of major federal action as including "actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly...." 40 C.F.R. § 1508.18.

Further the Tenth Circuit has required an EIS to be filed even where only non-discretionary ministerial agency action has occurred which enabled another to impact significantly on the environment. *See e. g., Davis v. Morton*, 469 F.2d 593, 596 (10th Cir. 1972); *Scenic Rivers Ass'n of Oklahoma v. Lynn*, 520 F.2d 240 (10th Cir. 1975), *rev'd on other grounds sub nom. Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 96 S.Ct. 2430, 49

L.Ed.2d 205 (1976). *Cf. NAACP v. Medical Center, Inc.*, 584 F.2d at 634 (no EIS required where Department's ministerial approval of capital expenditures plan under SSA not major federal action); *South Dakota v. Andrus*, 614 F.2d 1190 (8th Cir. 1980), *cert. denied*, 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980) (no EIS required where ministerial granting of mineral patent was not major federal action and did not enable recipient to affect environment).

■ Regardless of whether one characterizes the granting of or renewal of a right-of-way, or the granting of special use permits, as a major or ministerial act, courts have uniformly held that NEPA's EIS procedure applies where the federal government grants a lease, *Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975), *Davis v. Morton*, 469 F.2d at 597; issues a permit or license, *Greene County Planning Bd. v. Federal Power Comm'n*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); or grants a right-of-way, *Upper Pecos Ass'n v. Stans*, 452 F.2d 1233, 1237 (10th Cir. 1971), *vacated as moot*, 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972), *South Dakota v. Andrus*, 614 F.2d at 1194. These are major federal actions because they enable a private party to act so as to affect significantly the environment. *See also National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). In addition, I note that CEQ regulations define major federal actions as including "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. *Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.*" 40 C.F.R. § 1508.18(b)(4) (emphasis added).

Irrespective of whether major federal action is actually involved here and thus an EIS necessary before the Forest Service may issue an amended right-of-way or special use permits to Denver for the development of its water project, the Forest Service at this stage is merely requiring the preparation of an environmental assessment to determine whether an EIS is necessary.

The Forest Service therefore seeks information regarding Denver's proposed plans to study the possible impacts on the environment and the ecological system of the Williams Fork Basin. This approach is consistent with the Forest Service's procedures developed in consultation with the Council on Environmental Quality (CEQ) pursuant to 42 U.S.C. § 4332(2)(B) and the study and development procedures mandated by 42 U.S.C. § 4332(2)(E). I recognize that CEQ's interpretation of NEPA is entitled to substantial deference. *Andrus v. Sierra Club*, 442 U.S. at 358, 99 S.Ct. at 2341.

Specifically the CEQ guidelines require an agency to "prepare an environmental assessment on any account at any time in order to assist agency planning and decision making." 40 C.F.R. § 1501.3(b). The environmental assessment report (EAR) is not necessarily in lieu of an EIS but rather is a planning device for determining if further impact studies are required. CEQ's regulations define an environmental assessment as:

> a concise public document for which a Federal agency is responsible that serves to:
>
> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
>
> (2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.
>
> (3) Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a). The EAR should "include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(3), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

■ I conclude that the EAR required by the Forest Service in this instance is a "practicable means and measure" to carry out the stated policies of NEPA. The use of such environmental assessments has been recognized and approved by this court. *See*

*Hiatt Grain & Fee, Inc. v. Bergland,* 446 F.Supp. 457, 488–498 (D.Colo.1978), *aff'd* 602 F.2d 929 (10th Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 7551 (1980). I emphasize further that NEPA contemplates that the agency take the initiative in considering environmental values. *Jette v. Bergland,* 579 F.2d at 63–64. Denver incorrectly perceives the state of the law in advancing a "hands off" policy by federal agencies where action is to be taken which impacts upon the environment. The procedural requirements of NEPA are mandatory. *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1374 (10th Cir. 1980), and Denver cannot escape the compliance required by the Forest Service by insisting the Forest Service play no part in the further development of Denver's water project on national forest lands. The Forest Service is bound to consider the environmental consequences of its decision regarding any proposed amendment to the right-of-way, *Jette v. Bergland,* 579 F.2d at 63, although an EAR may be all that is necessary to comply with its procedural duties under NEPA. *See Stryker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

Therefore, I conclude that NEPA does apply and that Denver is required to cooperate with the Forest Service in the preliminary evaluation of environmental impacts arising from the further development of its proposed project. In reaching this decision, however, I do not decide the question whether an EIS should be required in the future. While the Forest Service need not prepare an EIS during the "germination process" of a potential proposal or plan for further development, this is not to say that at some later date an EIS will not be necessary. *Kleppe v. Sierra Club,* 427 U.S. at 401–406, 96 S.Ct. at 2726–2728. *Westinghouse Elec. Corp. v. United States Nuclear Regulatory Comm'n.,* 598 F.2d at 778.

Denver brings into issue whether an EIS is required for a continuing project assisted in some way by the federal government. Again I emphasize that the decision to formulate an environmental impact statement and the scope thereof is within the discretion of the agency. "Of course, an EIS need not be promulgated unless an agency's planning ripens into a 'recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment.' 42 U.S.C. § 4332(2)(c)." *Andrus v. Sierra Club,* 442 U.S. at 350 n.2, 99 S.Ct. at 2337 n.2. *See Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d at 1377; *Manygoats v. Kleppe,* 558 F.2d 556, 560 (10th Cir. 1977). The CEQ regulations provide:

> An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal . . . so that preparation can be completed in time for the final statement to include any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decision already made. . . . For instance:
>
> \* \* \* \* \* \*
>
> *(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with the applicable State or local agencies.*
>
> \* \* \* \* \* \*

40 C.F.R. § 1502.5 (emphasis added).

The fact that the Forest Service may be only contemplating further involvement in Denver's water project development by the granting of an amended right-of-way or special use permits certainly does not preclude the formation of an environmental assessment report and perhaps not a more detailed environmental impact statement. The Forest Service must consider environmental factors to some degree during the evolution of plans which will impact on the

national forest lands. *See Kleppe v. Sierra Club*, 427 U.S. at 406 n.15, 96 S.Ct. at 2728 n.15.

Although in the abstract Denver's Williams Fork Basin project is a "continuing" project, in reality little has been done since the early 1940's. Any new action taken by Denver which requires approval by the Forest Service might severely alter the environment thus requiring consideration of environmental factors. CEQ guidelines specify that major federal action requiring an EIS includes "new and *continuing activities*, including project and programs entirely or *partly* financed, *assisted*, conducted, *regulated, or approved* by federal agencies...." 40 C.F.R. § 1508.18 (emphasis added).

It is undisputed that federal agencies are not precluded from assessing in the first instance programs continually assisted by the federal government yet initiated prior to NEPA's enactment, or from re-assessing programs which are continuing in nature and yet require further federal approval. *See, e. g., Hart v. Denver Urban Renewal Authority*, 551 F.2d 1178, 1180–1182 (10th Cir. 1977); *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971), aff'g. 326 F.Supp. 151 (D.Kan.1971); *Steubing v. Brinegar*, 511 F.2d 489 (2d Cir. 1975); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); *Environmental Defense Fund, Inc. v. Tennessee Valley Authority*, 468 F.2d 1164 (6th Cir. 1972); *Swain v. Brinegar*, 517 F.2d 766 (7th Cir. 1975); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972), aff'g. 325 F.Supp. 728 (E.D.Ark.1971); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973). The legislative history indicates that major federal actions include the "expansion or revision of ongoing programs." S.Rep.No.91–296, p. 20 (1969) (*quoted in Andrus v. Sierra Club*, 442 U.S. at 363 n.21, 99 S.Ct. at 2344 n.21).

Although an EIS may not be required for a specific site where comprehensive studies have already taken place,

*Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Badoni v. Higginson*, 638 F.2d 172 (10th Cir. 1980); *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368 (10th Cir. 1980), an environmental assessment of some degree is required where none has been developed. If an EIS is prepared for a project which contains a reasonable, good faith discussion of NEPA requirements applicable to future actions contemplated in order to implement the program, supplemental assessments still may be required if a significant change occurs in the interval. *Id.* at 1377, *Manygoats v. Kleppe*, 558 F.2d at 560–61. As the Tenth Circuit stated in *Hart*, a continuing project is subject to NEPA's requirements "until it reaches 'that stage of completion where the cost of abandoning or altering the proposed project clearly outweigh [sic] the benefits [of] compliance.....'" *Hart v. Denver Urban Renewal Authority*, 551 F.2d at 1181, *citing Arlington Coalition on Transportation v. Volpe*, 458 F.2d at 1331, and *Swain v. Brinegar*, 517 F.2d at 773.

Denver essentially conceded the need for an environmental assessment of the Williams Fork Basin project by its actions prior to this lawsuit. Between 1973 and 1977 Denver, or its consultants, completed no less than five separate environmental reports of its own, each of which acknowledged the applicability of NEPA to the project. Denver was aware of the Forest Service's intention to subject further development to NEPA requirements. In its recommended acceptance of Denver's thirty-third progress report, the Forest Service specifically indicated that "an updated environmental analysis of [the Williams Fork Basin] project is necessary, particularly since this project has been so long in construction...." And the evidence shows that the two parties communicated the need to study environmental effects. In the Forest Service's December 12, 1973, letter to the BLM regarding further suspension of action on Denver's right-of-way based on its thirty-fourth report, the Forest Service noted that "the City is in the process of re-evaluating its entire diversion system plan for this area and has, at the

request of the Forest, initiated an environmental study to assess the alternatives." Thus the Forest Service recommended acceptance of the report subject to compliance with NEPA. Further, the Forest Service conducted environmental assessments of some degree in granting the eleven special use permits to Denver for all work associated with the project during the more recent years.

Despite Denver's objections, the Forest Service may be required by NEPA to assess environmental impacts by use of an EIS before authorizing further development of its water project plants—whether by granting an amended right-of-way or by issuing special use permits which will substantially alter the project's existing scope. In any event the use of an EAR at this stage is an appropriate means by which the Forest Service can comply "to the fullest extent possible" with its "continuing responsibility" to its mandate to manage the national forests.

### Grand County

As asserted in Grand County's motion to intervene and counterclaim, its position in this litigation is that in addition to the application of federal environmental law to Denver's Williams Fork Diversion Project, its land use regulations promulgated pursuant to state law are applicable, at least to the extent the proposed project is to be located within the territorial boundaries of Grand County. I agree that because Denver is required to obtain a Forest Service right-of-way permit or extension for the project that Denver's compliance with Grand County land use regulations is a prerequisite, but to what extent compliance is necessary I need not dwell on in detail. Throughout this litigation, I have been cautious to avoid crossing the line into legal territory which is properly for determination by state courts. But as a matter of federal law the FLPMA requires "compliance with state standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards," 43

U.S.C. § 1765, and NEPA requires that in the environmental assessment of projects which will have an impact upon the environment the federal government must, "*in cooperation with State and local governments* ... use all practicable means and measures ..." to protect the environment. 42 U.S.C. § 4331(a) (emphasis added). Federal regulations implementing NEPA equally mandate involvement of state and local authorities. *See e. g.*, 40 C.F.R. §§ 1501.-2(d)(2); 1501.5(b), (d); 1501.7(a)(1); and 1605.2. Further, the Forest Service expressed its duty to consult with Grand County in its document dated December 14, 1973.

The federal laws and the agreement between the Forest Service and Grand County Commissioners make clear that local authorities must be entitled to involvement in any further proceedings concerned with Denver's proposed development of the Williams Fork Diversion Project and its compliance with the requirements of the FLPMA and NEPA. Whether in the context of an EAR or an EIS, federal agencies are required to take into consideration substantive provisions of county land use regulations. The scope of that consideration is another matter. It is clear that where conflicts arise between federal regulations and state and local regulations regarding public land the latter are preempted. *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), *Ventura Co. v. Gulf Oil Corp.*, 601 F.2d 1080 (9th Cir. 1979), *aff'd*, 445 U.S. 947, 100 S.Ct. 1593, 63 S.Ct. 782 (1980). As the Supreme Court stated in *Kleppe*:

Absent consent or cession, a state undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the property clause. * * * And when Congress so acts, the federal legislature necessarily overrides conflicting state laws under the Supremacy Clause. * * * As we said in *Camfield v. United States*, 167 U.S. [518], at 526 [17 S.Ct. 864, at 867, 42 L.Ed. 260] [1897], in response to

a somewhat different claim: "A different rule would place the public domain of the United States completely at the mercy of state legislation."

426 U.S. at 543, 96 S.Ct. at 2293 (citations omitted). At this point, it is premature to determine the consonance of the federal and Grand County regulations. That is a matter for initial determination by the federal agencies involved once they determine the degree and kind of federal environmental regulation which is appropriate for Denver's proposed project.[59]

However, as an ancillary claim, Grand County seeks a determination from this court whether the county regulations are applicable as a matter of Colorado law to Denver's Williams Fork Diversion Project. At the outset, I find that many of the state questions are intermeshed with controlling federal law questions. In addition, I asserted pendent jurisdiction over these claims and testimony and evidence were presented regarding them during trial. The parties have fully briefed the factual and legal disputes. Having considered the claims, I find no novel state law question requiring certification to the Colorado Supreme Court for resolution pursuant to provisions of Colorado Appellate Rule 21.1, or requiring abstention on my part, although I am aware that some of the issues are being litigated in state court. I conclude that in the interest of judicial economy the matters should be resolved as expeditiously as possible.

### Denver's Immunity

■ I hold that Denver is not immune from regulation by Grand County in the development of its water project without its local boundaries and on national forest lands within Grand County. Denver asserts that as a home-rule city pursuant to Article XX of the Colorado Constitution it has the eminent domain authority to regulate matters of local concern.[60] First of all it is questionable that one can characterize Denver's proposed project as one limited to local concern. Nonetheless Colorado law holds that Denver, as a home-rule city, may extend its water services beyond its boundaries. *Colorado Open Space Council, Inc. v. City and County of Denver*, 190 Colo. 122, 543 P.2d 1258 (1975). However, *Colorado Open Space Council* refers to the superseding authority of home-rule cities over conflicting state laws "within the territorial limits and other jurisdiction of said city or town...." *Id.* at 123, 543 P.2d at 1259. Denver's right-of-way on national forest lands is not property unencumbered upon which it has the ability *vel non* to condemn lands for its water project. Rather, applicable federal environmental laws require federal as well as state and local regulation to protect the environment. Federal law clearly preempts Denver's alleged sovereign rule. *See Kleppe v. New Mexico*, 426 U.S. at 543, 96 S.Ct. 2293.

While Colorado law holds that the development of water works systems is a constitutionally mandated right that the *legislature* cannot abrogate, *City of Thornton v. Farmers' Reservoir & Irrigation Co.*, 194 Colo. 526, 535, 575 P.2d 382, 389 (1978),

---

**59.** I note that the mere fact that congress has legislated in the same area as a state does not, in itself, preempt the state regulation. Concurrent state regulation will be preempted only in certain circumstances, as where congress specifically manifests an intent to override state law, *New York State Dept. of Social Services v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); the federal legislation is so pervasive as to imply intent to occupy the entire field, *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972); if compliance with both the state and federal regulations would be impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); or frustrate

an important federal policy, *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

**60.** Article XX, § 1 of the Colorado Constitution provides in part that a home-rule city such as Denver:

> shall have the power, within or without its territorial limits, to construct, condemn and purchase, purchase, acquire, lease, add to, maintain, conduct, and operate water works ... *local in use and extent, in whole or in part and everything required therefore, for the use of said City and County and the inhabitants thereof....*

(Emphasis added)

different considerations come into play where the development of the water project is on federal lands. Article XX cannot afford Denver immunity from regulation by the federal or state government where such is mandated for projects which fall within the scope and purview of the FLPMA and NEPA.

Further, Colorado law makes clear that while Denver has the constitutional power to condemn and construct, such power does not render it immune from statutory regulation of the physical impact of such construction. *See Town of Glendale v. City and County of Denver*, 137 Colo. 188, 195, 322 P.2d 1053, 1057 (1958), *People of Lakewood v. Haase*, 596 P.2d 392, 394 (Colo. 1979). In *Town of Glendale* the Colorado Supreme Court recognized Denver's Article XX right to condemn land and to construct a sewer line through Glendale territory however not without regard to Glendale's local ordinances.

> What we have said is not to be understood as holding that Denver can with impunity and without regard to local ordinances of a traversed municipality construct its sewer lines in its streets irrespective of water lines, water works, sewers or wells in line of or in the vicinity of the proposed construction.

137 Colo. at 195, 322 P.2d at 1057. Denver, in operating a water works system, acts in a proprietary capacity and not a governmental capacity. In so acting it is governed largely by the same rules that apply to a private corporation such as police power regulation. *Colorado Open Space Council, Inc. v. City and County of Denver*, 190 Colo. at 125, 543 P.2d at 1260 (*citing County of Larimer v. City of Fort Collins*, 68 Colo. 364, 189 P. 929 (1929)).

I note that the regulation of land use granted to county governments by Colorado's Local Government Land Use Control Enabling Act of 1974, Colo.Rev.Stat. § 29–20–101 *et seq.*, part of the statutory authority under which Grand County adopted its administrative regulations, has been the subject of little judicial interpretation by the state courts. While the intent of the act was "to clarify and provide broad authority to local governments to plan for and regulate the use of the land within their respective jurisdictions," Colo.Rev.Stat. § 29–20–102, there is some uncertainty as to the significance of the act with respect to constitutionally empowered home-rule municipalities. Commentators have, however, suggested that the regulation of land use has regional and statewide consequences and therefore might more properly be a matter of statewide concern and control rather than a matter of sovereign control by local municipalities. The act is a constitutional "attempt by the state to prompt restrictions on land use powers contained in the charters of home rule cities." White and Petros, *Land Use Legislation: H.B. 1034 and H.B. 1041*, 6 Colo.Law. 1687, 1688 (1977).

I note further that the second statute under which Grand County promulgated its administrative regulations, the Colorado Land Use Act, Colo.Rev.Stat. § 24–65.1–101 *et seq.*, delegates to the counties power to supervise land use with regard to areas and activities of "state interest", *i. e.*, which may have an impact on the people of the state beyond the immediate scope of the project. *Colorado Land Use Comm'n v. Board of County Comm'rs of Larimer County*, 604 P.2d 32, 34 (Colo.1979). Section 24–65.1–101(1)(c) of the Act declares that "[i]t is the intent of the general assembly that land use, land use planning, and quality of development are matters in which the state has responsibility for the health, welfare, and safety of the people of the state and for the protection of the environment of the state."

■ Without passing on the interpretation and constitutionality of the two laws I recognize that Colorado law provides for concurrent state and municipal power to regulate where areas of "mixed" state and local concern exist, *Pierce v. City and County of Denver*, 193 Colo. 347, 349, 565 P.2d 1337, 1338 (1977); *City of Aurora v. Martin*, 181 Colo. 72, 507 P.2d 868 (1973), and preemption of local rule in areas of exclusive state-wide concern, *Century Elec. Service &*

*Repair, Inc. v. Stone*, 193 Colo. 181, 183–184, 564 P.2d 953, 955 (1977); *Vick v. People*, 166 Colo. 565, 445 P.2d 220 (1968), *cert. denied*, 394 U.S. 945, 89 S.Ct. 1273, 22 L.Ed.2d 477 (1969). *See City of Colorado Springs v. State of Colorado*, 626 P.2d 1122 (Colo. 1980); *Frick v. Abell*, Colo., 602 P.2d 852 (1979); *DeLong v. City and County of Denver*, 195 Colo. 27, 576 P.2d 537 (1978).

I have indicated that the Williams Fork Diversion Project is not only to be developed on national forest lands but also to be developed exclusively outside Denver's territorial limits. In ruling on the scope of Article V, § 35 of the Colorado Constitution, which prohibits state regulation or interference with municipal property of home-rule cities,[61] the Colorado Supreme Court held that the provision did not restrict regulation of facilities outside the home-rule city's territory. *City of Loveland v. Public Utilities Comm'n*, 195 Colo. 298, 580 P.2d 381 (1978). *See also, City and County of Denver v. Public Utilities Comm'n*, 181 Colo. 38, 507 P.2d 871 (1973). The rationale of the decision is that extra-territorial citizens have no recall of Denver officials for utility services rendered and therefore they need state regulatory protection. I am persuaded by Grand County's argument in the context of this case that the residents of their county also must rely on the protection of the state and the Board of County Commissioners to regulate land use and for protection of their interests by the police power regulation of Denver while inside Grand County's territory. The enactment of the two land use control statutes suggests that Grand County is empowered to regulate land use development within its territorial limits. The development of the Williams Fork Diversion Project is not exclusively a matter of local concern and therefore the immunity afforded by Article XX and asserted by Denver is inapplicable. This consideration coupled with the fact that federal law requires consideration of state and local environmental regulations preempts any immunity held by Denver.

The Grand County land use regulations are thus applicable to the project to the extent permitted and required by federal law.

Application of Specific Regulations

A question remains whether the specific regulations as promulgated by Grand County apply. These regulations pertain to comprehensive land use, subdivisions, zoning, buildings, and major extension of existing domestic water and sewage treatment systems. Simply put Denver argues that the specific regulations do not legally apply to the Williams Fork Diversion Project; that the subdivision regulations, zoning regulations, building code, and comprehensive land use plan on their face do not apply; that the regulations are confiscatory in nature and deprive Denver of its water rights; that the building code exceeds its statutory authority; that the comprehensive land use plan is without discernible standards; that Denver is exempt from the Colorado Land Use Act; that the administrative regulations were not promulgated according to procedural requirements; and that the specific regulations conflict with Denver's power of eminent domain granted pursuant to Article XX. I believe I have sufficiently addressed the last point. Regarding the legal authority and application of the Grand County regulations to the Williams Fork Diversion Project I note that the regulations are typical exercises of police powers delegated to counties in their capacity as regulatory arms of the state. *See Asphalt Paving Co. v. Board of County Comm'rs*, 162 Colo. 254, 425 P.2d 289 (1967). The regulations are consistent with the county's broad discretionary powers to classify and regulate uses of land. *See Board of County Comm'rs of Boulder v. Echternacht*, 194 Colo. 311, 314, 572 P.2d 143, 145 (1977). Pursuant to Colo. Rev.Stat. §§ 30–28–101 et seq., 30–28–106, 30–28–201, and 30–28–203, Grand County has exercised its statutorily delegated power by the adoption of the Comprehensive Land Use Regulations. Pursuant to the

**61.** Like Article XX, Article V, § 35 affords home-rule cities special privileges and immunities.

Local Government Land Use Control Enabling Act, Colo.Rev.Stat. § 29–20–101 *et seq.,* and the Colorado Land Use Act, Colo.Rev. Stat. § 24–65.1–101 *et seq.,* Grand County has exercised its statutorily delegated power by the adoption of its administrative regulations. *Colorado Land Use Comm'n v. Board of County Comm'rs of Larimer County,* Colo., 604 P.2d at 34. They apply to the federal land situated in Grand County, including the Williams Fork Basin, to the extent consistent with federal law.

### Subdivision Regulations

Regarding the application of specific regulations to the Williams Fork Diversion Project, I agree with Denver that the subdivision regulations do not on their face apply. Clearly Denver has no plans nor has made application to build apartments, condominiums, dwelling units, or any other construction activities or division of property which fall within the purview of the regulations. Denver is correct that Grand County has the cart before the horse on this matter. Until such time as plans are developed, if at all, to subdivide, resubdivide or replat lots, tracts or parcels of lands, and application is made therefor pursuant to the regulations, their applicability is not ripe for determination.

### Zoning Regulations

The application of Grand County's zoning regulations to the Williams Fork Diversion Project requires a request for a special permit by Grand County after a "special review" since the development of the project will occur in the Forestry & Open Zoning District within the county and will involve transbasin diversion. In order to receive the permit, information must be submitted regarding environmental impacts. *See* note 13, *supra.* On the regulations face they are applicable but only to the extent they do not conflict with federal regulation or Denver's vested water rights. I emphasize this point because Denver has alleged that the county regulations seek in sum to regulate to the extent of precluding *any* transbasin diversion of water within the county and thus they are confiscatory in nature.

Grand County counters that the regulations merely attempt to mitigate adverse environmental impacts on the construction and operation of transbasin diversion projects.

 Although Article XVI, § 6 of the Colorado Constitution confers a right to divert and appropriate unappropriated water of the state this right is not absolute. The manner and method of appropriation of water may be reasonably regulated. *See White v. Farmers' Highline Canal & Reservoir Co.,* 22 Colo. 191, 43 P. 1028 (1896); *Larimer County Reservoir Co. v. People,* 8 Colo. 614, 9 P. 794 (1885). *See also, Weibert v. Rothe Bros.,* 618 P.2d 1367 (Colo.1980), *Kuiper v. Warren,* 195 Colo. 541, 580 P.2d 32, *cert. denied,* 439 U.S. 984, 99 S.Ct. 575, 58 L.Ed.2d 656 (1978). Essentially the arguments here mirror the federal claims. Denver is clearly the holder of water rights in the Williams Fork Valley, both conditional and absolute dating back to a priority of July 4, 1921. *See United States of America v. Northern Colorado Water Conservancy District, et al.,* Civ.Nos. 2782, 5016 and 2017 (D.Colo.1955) ("Blue River Decree"), and Colorado River Storage Project and Participating Projects Act, § 11, Pub.L. 485, 70 Stat. 105, 43 U.S.C. § 620j. However, as in the federal case, the water entitlement does not carry with it absolute rights of access to build and operate.

Denver asserts its absolute right to appropriate and divert water is grounded in Article XVI, §§ 5 and 6 of the Colorado Constitution which makes water of the Colorado streams public, dedicated to the use of the people of the state. The article expresses the right to divert unappropriated water for beneficial use as one which shall never be denied. Domestic purposes are given priority in appropriation. *See also* Colo.Const., art. XVI, § 7. The Colorado Water Rights Determination and Administrative Act of 1969, Colo.Rev.Stat. § 37–92–101 *et seq.,* establishes a regulatory scheme for the administration, determination, and adjudication of water rights. The act sets forth the duties and responsibilities of the state engineer with respect to determination and administration of water rights, es-

tablishes a regulatory scheme specifically to deal with water violations, and establishes a system of water courts and referees throughout the state. This act and Colorado case law, which is replete with examples of reasonable restriction upon diversion and appropriation of water within the state,[62] make clear that the right to appropriate and divert water is not absolute.

Serious questions are raised as to both the appropriateness of Grand County zoning regulations within this scheme of state regulation and the possible prohibited interference with vested water rights. Grand County argues, however, that its regulations do not usurp the state's role in the adjudication and administration of water rights in accordance with decreed priorities but rather only the environmental impacts caused by large diversions of water in accordance with the land use laws. The two are not necessarily inconsistent. At this stage, it is impossible to ascertain whether the *application* of the county regulations conflicts with state regulation of diversion thus requiring preemption or whether they are in harmony with state law in regard to matters of mixed state and local concern. *See Pierce v. City and County of Denver*, 193 Colo. at 349, 565 P.2d at 1338; *Century Elec. Services & Repair, Inc. v. Stone*, 193 Colo. at 183–184, 564 P.2d at 955; *Vela v. People*, 174 Colo. 465, 466–67, 484 P.2d 1204, 1205 (1971); *Davis v. City and County of Denver*, 140 Colo. 30, 35, 342 P.2d 674, 674 (1959).[63] On their face the regulations do not appear to be in conflict with state law.

### Building Code

Denver asserts that the Grand County Building Code does not on its face apply to the Williams Fork Diversion project and that in trying to apply it Grand County has

exceeded its statutory authority. The county code, adopted pursuant to Colo.Rev.Stat. § 30–28–201 *et seq.*, is applicable to the Williams Fork Diversion project only to the extent Denver makes application for the construction of dwellings, buildings, and structures. A structure is defined by state statute as "a combination of roof and supporting walls and columns." Colo.Rev.Stat. § 30–28–201. The code does not pertain to the construction of diversion boxes, conduits, check dams, bypasses, flumes, or similar appurtenances of the project.

### Comprehensive Land Use Regulations

As to the application of Grand County's comprehensive land use regulation and its component parts previously addressed, I find that the regulations on their face apply to the Williams Fork Diversion Project to the extent consistent with this opinion. Denver argues that the comprehensive land use plan is without discernible standards for compliance and is therefore void. At this point, Denver has the cart before the horse. No application has been made and no compliance sought with the regulations. In addition, the regulations are quite specific as to procedure. Whether a specific regulation cannot be complied with upon application must be determined at a later date if such disputes become ripe for determination. However, on their face, the regulations are reasonable and not arbitrary or capricious. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Colby v. Board of Adjustment*, 81 Colo. 344, 255 P. 443 (1927). Even if standards do not exist, precise and unvarying in form but rather general and indefinite, such may be necessary with respect to a regulatory enactment such as Grand

---

**62.** *See, e. g., A–B Cattle Co. v. United States*, 196 Colo. 539, 589 P.2d 57 (1978); *Thompson v. Colorado Ground Water Comm'n*, 194 Colo. 489, 575 P.2d 372 (1978).

**63.** Colorado laws holds that to preempt local law in matters of "mixed state and local concern" the state statute must clearly express preemption or there must be an unavoidable conflict in the application of the state and local law. *Pierce v. City and County of Denver*, 193 Colo. at 349, 565 P.2d at 1338; *City of Aurora*

*v. Martin*, 181 Colo. at 75, 507 P.2d at 869–70; *Ray v. City and County of Denver*, 109 Colo. 74; 121 P.2d 886 (1942). An unavoidable conflict would exist, for example, if compliance with both state and local regulation would be impossible, or if an important state policy would be frustrated by the local control, or if the state regulatory scheme would be so pervasive as to imply an intent by the state to occupy the entire field.

County's regulations. *See Elizondo v. State Dept. of Revenue*, 194 Colo. 113, 116–117, 570 · P.2d 518, 529 (1977); *Asphalt Paving Co. v. County Comm'rs*, 162 Colo. at 262–263, 425 P.2d at 294; *Fry Roofing Co. v. Colorado Dept. of Health Air Pollution Variance Bd.*, 179 Colo. 223, 228–229, 499 P.2d 1176, 1180 (1972).

Administrative Regulations

■ Denver makes two arguments regarding the administrative regulations for major extensions of existing domestic water and sewage treatment systems—first, that Denver falls within the exemptions to the Colorado Land Use Act, Colo.Rev.Stat. § 24–65.1–101 *et seq.*, and second, that due to procedural defects, the Grand County regulations are null and void. Denver claims exemption from the act under section 24–65.1–105 which provides:

(1) With regard to *public utilities*, nothing in this Article, shall be construed as enhancing or diminishing the power and authority of *municipalities, counties*, or the *public utilities commission*.

\* \* \* \* \* \*

(2) Nothing in this Article shall be construed as enhancing or diminishing the rights and procedures with respect to the power of a *public utility* to acquire property and rights-of-way by eminent domain to serve public need in the most economical and expedient manner.

(emphasis added). The Denver Water Board is not a public utility in the provision of extra-territorial water services; this was stipulated by the parties in their pretrial order and Denver concedes this has been its legal position for the last thirty years. This is also the position of the Colorado Supreme Court. *See City of Englewood v. City and County of Denver*, 123 Colo. 290, 229 P.2d 667 (1951). I cannot agree that the exemption refers to public utilities in the "generic sense", *i. e.*, municipal utilities serving outside their territorial boundaries.

Second, Denver claims that it is exempted by section 24–65.1–106 which provides that "[n]othing in this Article shall be construed

as: (a) enhancing or diminishing the rights of owners of property as provided by the state constitution or the constitution of the United States; (b) Modifying or amending existing laws or court decrees with respect to the determination and administration of water rights." Again Denver's argument mirrors that of the federal government. As discussed above, the Grand County regulations on their face do not amend or modify the Blue River Decree or diminish Denver's water rights. Rather they address the environmental impacts of water diversion and carriage structure, and ancillary features such as access roads. The Blue River Decree and the Colorado River Storage Project and Participating Projects Act, 43 U.S.C. § 620 *et seq.*, do not give Denver free rein to construct its project irrespective of applicable federal, state and local law. Denver has failed to show it is accorded exemption under this provision.

■ The third statutory exemption asserted is based upon section 24–65.1–107 which provides in · part:

(1) This article shall not apply to any development in an area of state interest or any activity of state interest which meets any one of the following conditions as of May 17, 1974:

\* \* \* \* \* \*

(b) The development or activity has been approved by the electorate.

\* \* \* \* \* \*

On November 6, 1973, the people of the City and County of Denver voted for and approved a bond issue in the amount of $160,-000,000.00 "for the purposes of constructing or otherwise acquiring improvements, extensions, or additions to the municipal water work systems and plant." Denver claims the Williams Fork Diversion Project and extensions thereto was one of the projects "approved" in this bond election. I hold that the lack of reference to the Williams Fork Diversion Project in the bond election ballots compels my finding that the Denver electorate did not "approve" the specific project. A bond question must be

construed primarily from the wording of the instrument itself.[64] Moreover, I disagree with Denver's interpretation of the statutory exemption. In reading this exemption in conjunction with the others within this provision, which refer to approval by local governmental authorities, and in reviewing legislative references to the purposes for the addition of this particular exemption I think the only reasonable construction is that the electorate refers to the appropriate local electorate which is affected by the approval of a project and which accepts, by its approval, the consequences of an exemption from land use control under the act. Denver, as a foreign municipality, cannot nullify the land use regulations of Grand County by approving, through an election, bonds to pay for the development of a water project on lands situated in Grand County. The exemption does not apply to Denver in the development of the Williams Fork Diversion Project.

█ Finally, Denver argues that the administrative regulations are procedurally deficient because Grand · County failed to notify the Colorado Land Use Commission of a public hearing on the regulations.[65] Section 24–65.1–404(2)(a) states that:

> [t]he local government shall send written notice to the Colorado Land Use Commission of a public hearing to be held for the purpose of designation and adoption of guidelines at least thirty days and not more than sixty days before such hearing.

The evidence showed that on October 25, 1979, the Land Use Commission had not in fact received a copy of the public notice of hearing and that it would not approve the regulations until notice was received. The commission, however, approved the regulations on October 26, 1979. Public notice of the hearing was indeed published and mailed to all interested persons on the county's mailing list pursuant to Colo.Rev.Stat. § 24–65.1–404(1) and (2)(a).

I find that any failure to give formal notice to the Land Use Commission, although not definitively shown by Denver, is a minor defect which cannot render the regulations void. As with zoning laws, minor technical defects are not sufficient to invalidate the regulations which are presumptively valid absent a showing of substantial noncompliance with statutory authority. *See City of Commerce v. Cooper,* 609 P.2d 106 (Colo.1979); *cert. denied,* 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 265 (1980); *Hopkins v. County Comm'rs,* 193 Colo. 230, 564 P.2d 415 (1977); *City of Greeley v. Ells,* 186 Colo. 352, 527 P.2d 538 (1974). Further, the purpose of the notice to the Land Use Commission is to prompt recommendations regarding the regulations; its function is advisory only. Colo. Rev.Stat. § 24–65.1–406(3). The commission obviously fulfilled its purpose of a recommendation of approval without the written notice. The procedural defect, if any, is *de minimis* and does not invalidate the regulations.

I emphasize that my ruling is narrow in scope and applies only to the Grand County regulations as they apply to the Williams Fork Diversion Project. This is not a comprehensive opinion on the validity of the Colorado land use laws. In the context of this case, the regulations apply in accordance with federal law. and to the extent

---

**64.** Denver may have implicitly approved the project by approving bonds for it but this stretches the scope of the statutory exemption too far. Where there are expressly stated exemptions to a statute additional exemptions by implication are not favored. *Colorado Public Interest Research Group, Inc. v. Train,* 507 F.2d 743 (10th Cir. 1974), *rev'd on other grounds sub nom. Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976).

**65.** I note that Denver has filed a lawsuit in Denver District Court challenging the procedural validity of Grand County's administrative regulations. *Northern Colorado Water Conservancy Dist., et al. v. Board of Comm'rs of Grand County,* Civ.No. 79–CV–8173, District Court, City and County of Denver. However, pendency of an action in state court is no bar to a proceeding concerning the same matter in federal court. Because abstention is the exception and not the rule, *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), and because this matter was presented to this court for adjudication, I decline to abstain.

they are consistent with this opinion. This ruling is consistent with my upholding the administrative decision of the Forest Service of January 12, 1979, which requires Denver's compliance with applicable state environmental laws.

## CONCLUSION

I hold that the administrative decisions of the Forest Service, including the February 13, 1979, order and the May 8, 1979, order of the Forest Service Chief affirming the January 12, 1979, order were not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. The decisions were based on a consideration of all relevant factors, were not a clear error or judgment, and the conclusions drawn therefrom were rationally-based. *See Bowman Transp., Inc. v. Arkansas-Best Freight Systs., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Denver has constructed off its 1924 right-of-way grant. In order to complete its proposed course of construction onto national forest lands for the Williams Fork Diversion Project it must make appropriate application for special use permits or an amended right-of-way in compliance with existing federal law and state law where consistent with federal standards. Therefore it is

ORDERED that Judgment be and hereby is entered for the defendants United States of America and the federal defendants, and defendant-intervenors Sierra Club, American Wilderness Alliance and Grand County Commissioners; further it is

ORDERED that plaintiff's Complaint be and hereby is dismissed; and further it is

ORDERED that Judgment consistent with this opinion be and hereby is granted for the defendant-intervenor on its counterclaims.